

**Law Offices Of Lenore Albert**

7755 Center Avenue
Suite #1100
Huntington Beach, California
92647
www.InteractiveCounsel.com

Telephone: (714) 372-2264
Fax: (419) 831-3376

---

August 24, 2013                    <u>*Filed and Served via Electronic Filing*</u>

Molly C. Dwyer, Clerk of the Court
United State Court of Appeals for the Ninth Circuit
95 Seventh Street
San Francisco, CA  94103-1526


Re:    *Benson v Ocwen Loan Servicing, LLC* Appellate Case No. 12-56595

Dear Clerk of the Court:

   Appellant submits this F.R.A.P. 28(j) letter citing the recent unsealing of the false claims act case of *Linda Szymoniak v American Home Mortgage Servicing*, et al, 10-cv-01465-JFA, that was unsealed on or after August 14, 2013.

   The case supports Appellant's overriding argument in the opening brief, and in the reply brief that his loan was never securitized, so the servicer had no incentive to work with him and as a result, he lost his home.  For convenience, a copy of unsealed Second Amended Complaint is enclosed.

   The heads of the State of California knew about this but let the homeowners become homeless because they were too busy saving their own pensions.

Respectfully Submitted,

Lenore L. Albert, Esq.
*Counsel for Plaintiff/Appellant*
*Levi Benson, III*

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE:
I declare that I am over the age of 18 years, and not a party to the within action; that I am employed in Orange County, California; my business address is 7755 Center Ave Suite #1100, Huntington Beach, CA 92647. On August 24, 2013 I served a copy of the following document(s) described as:

**APPELLANT'S F.R.A.P. 28(j) re:**
**LINDA SZYMONIAK v AMERICAN HOME SERVICING**
On the interested parties in this action as follows:

For Defendant Ocwen Loan Servicing, LLC and Defendant HSBC Bank USA, NA as trustee on behalf of ACE securities Corp., home equity loan trust and for the registered holders of ACE securities Corp., home equity loan trust, series 2007-ASAP2, asset backed pass-through certificates:
Eric D. Houser, Esq. Steven S. Son, Esq.
HOUSER & ALLISON
3760 Kilroy Airport Way, Suite 260
Long Beach, CA 90806
Ph: (949) 679-1111
Fx: (949) 679-1112
sson@houser-law.com
ehouser@houser-law.com

 **[x] BY CM/ECF –** I caused such document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth pursuant to FRCP 5(d)(1).

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

August 24, 2013

_s/Tim Shaffer_
Tim Shaffer

# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| *Ex rel.* | ) | |
| | ) | |
| [UNDER SEAL], | ) | C.A. No.10-cv-01465-JFA |
| | ) | |
| **Plaintiff-Relator,** | ) | |
| | ) | **SECOND AMENDED** |
| | ) | **COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| [UNDER SEAL], | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

# FILED IN CAMERA AND UNDER SEAL

# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| the States of CALIFORNIA, | ) |
| DELAWARE, FLORIDA, HAWAII, ILLINOIS | ) |
| INDIANA, MASSACHUSETTS, MINNESOTA | ) |
| MONTANA, NEVADA, NEW HAMPSHIRE | ) |
| NEW JERSEY, NEW MEXICO, NEW YORK | ) |
| NORTH CAROLINA, | ) |
| RHODE ISLAND, VIRGINIA, | ) |
| the DISTRICT OF COLUMBIA, | ) |
| the CITY of CHICAGO, and | ) |
| the CITY of NEW YORK | ) |
| | ) |
| **Plaintiffs,** | ) **FILED UNDER SEAL pursuant to** |
| *Ex rel.* | ) **31 U.S.C. § 3730(b)(2)** |
| | ) |
| LYNN E. SZYMONIAK, | ) C.A. No.10-cv-01465-JFA |
| | ) **SECOND AMENDED** |
| **Plaintiff-Relator,** | ) **COMPLAINT** |
| | ) |
| v. | ) |
| | ) |
| AMERICAN HOME MORTGAGE SERVICING, | ) |
| INC.; | ) |
| SAXON MORTGAGE SERVICES, INC.; | ) |
| LENDER PROCESSING SERVICES, INC.; | ) |
| DOCX, LLC; | ) |
| CITIMORTGAGE, INC., f/k/a | ) |
| CITI RESIDENTIAL LENDING, INC., f/k/a | ) |
| AMC MORTGAGE SERVICES, INC.; | ) |
| WELLS FARGO HOME MORTGAGE d/b/a | ) |
| AMERICA'S SERVICING COMPANY, | ) |
| BANK OF AMERICA CORPORATION, | ) |
| as successor-in-interest to Lasalle Bank; | ) |
| THE BANK OF NEW YORK MELLON; | ) |
| CORPORATION; | ) |
| CITIBANK, NATIONAL ASSOCIATION; | ) |
| DEUTSCHE BANK NATIONAL TRUST | ) |
| COMPANY; | ) |
| DEUTSCHE BANK TRUST COMPANY | ) |
| AMERICAS; | ) |
| HSBC USA, NATIONAL ASSOCIATION; | ) |
| J.P. MORGAN CHASE BANK, NATIONAL | ) |
| ASSOCIATION; | ) |

U.S. BANK, NATIONAL ASSOCIATION; and )
WELLS FARGO BANK, NATIONAL )
ASSOCIATION; )
 )
**Defendants.** )
—————————————————————————————)

**RICHARD A. HARPOOTLIAN P.A.**
**Richard A. Harpootlian, Esq.**
**1410 Laurel Street**
**Post Office Box 1090**
**Columbia, SC 29202**
**Telephone:    (803) 252-4848**

**GRANT & EISENHOFER P.A.**
**Jay W. Eisenhofer, Esq.**
**James J. Sabella, Esq.**
**Lydia Ferrarese, Esq.**
**485 Lexington Avenue**
**New York, NY 10017**
**Telephone:    (646) 722-8500**
**Facsimile:    (646) 722-8501**

**JANET, JENNER & SUGGS, LLC**
**Howard Janet, Esq.**
**Woodholme Center**
**1829 Reisterstown Road, Suite 320**
**Baltimore, MD 21208**
**Telephone:    (410) 653-3200**
**Facsimile:    (410) 653-9030**

**GRANT & EISENHOFER P.A.**
**Reuben Guttman, Esq.**
**1920 L Street, N.W., Suite 400**
**Washington, D.C. 20036**
**Telephone:    (202) 386-9500**
**Facsimile:    (202) 350-5908**

**JANET, JENNER & SUGGS, LLC**
**Kenneth M. Suggs, Esq.**
**500 Taylor Street**
**Columbia, SC 29201**
**Telephone:    (803) 726-0050**
**Facsimile:    (410) 653-9030**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ......................................................................................................... 1

II. JURISDICTION AND VENUE ................................................................................... 5

III. PARTIES ................................................................................................................... 5

    A.    Relator ............................................................................................................ 5

    B.    Defendants .................................................................................................... 6

IV. BACKGROUND ....................................................................................................... 9

    A.    Real Estate Sale, Mortgage Finance and Foreclosure Procedures ................ 9

    B.    Relator's Mortgage .................................................................................... 10

    C.    Foreclosure Proceedings Against Relator .................................................. 11

    D.    Relator Discovers a Forged Mortgage Assignment Filed in Her Foreclosure by DBNTC ........................................................................... 12

    E.    Relator Reports Discovery of Mortgage Assignment Fraud to Authorities ............. 16

V. THE MORTGAGE-BACKED SECURITIES MARKET ......................................... 17

    A.    Mortgage-backed Securities Trusts and the Trustees' Role ...................... 17

    B.    Mortgage-backed Securities Trusts, Controlled by the Trustee Bank Defendants Allegedly Purchased Notes and Mortgages on Homes in South Carolina and Across the United States ............................................ 18

    C.    The Foreclosure Problem in South Carolina and the United States........... 20

    D.    Defendants' Role in the Foreclosure Actions in the South Carolina Courts and Defendants' Filing of Forged Mortgage Assignments in South Carolina, and Across the United States, Worsening the Foreclosure Problem ................................................................................ 22

VI. DEFENDANTS' ACTS VIOLATE THE FALSE CLAIMS ACT ......................... 24

    A.    False Corporate Officer Titles and Forged Signatures ............................. 27

        1.    South Carolina ................................................................................ 27

2. Georgia ........................................................................................ 30

3. Florida ......................................................................................... 41

4. Minnesota .................................................................................... 43

B. Mortgage Assignments Signed By Officers Of The Grantee Fraudulently Identifying Themselves As Officers Of The Grantor ................................. 51

C. Defendants' Use of Fake Documents, False Officer Titles, and Forged Signatures Violates the Federal Lending Laws, and State Mortgage Fraud and Notary Fraud Laws ................................................................................ 55

D. Defendants' False Statements To The Investors ........................................ 56

VII. THE U.S. GOVERNMENT PURCHASED MORTGAGE-BACKED SECURITIES MADE UP OF MORTGAGES WITH MISSING OR FORGED ASSIGNMENTS FROM ORIGINATING BANKS TO THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL FINANCIAL HARM ....................................... 63

A. Types of MBS .......................................................................................... 63

B. MBS Purchases by Federal Reserve Funding of Maiden Lane Transactions ............. 63

C. MBS Purchases by Treasury Financing of Public-Private Partnership Funds ........... 68

D. MBS Purchases by Federal Reserve and Treasury Direct Purchases ....................... 71

E. Damages to the U.S. Government ................................................................. 71

1. Impaired Value of MBS ....................................................................... 71

2. Overcharges for fraudulent services and services not provided ...................... 72

3. Fannie Mae and Freddie Mac ............................................................... 73

4. Federal Taxes From Trusts' Loss of Tax Status due to Assignments Made After the Date of Trust Formation ............................................... 75

VIII. THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, HAWAII, ILLINOIS, INDIANA, MASSACHUSETTS, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, RHODE ISLAND, VIRGINIA, DISTRICT OF COLUMBIA, THE CITY OF CHICAGO AND THE CITY OF NEW YORK PURCHASED MORTGAGE-BACKED SECURITIES MADE UP OF MORTGAGES WITH MISSING OR FORGED ASSIGNMENTS FROM ORIGINATING BANKS TO THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL FINANCIAL HARM ...... 76

IX. CAUSES OF ACTION .................................................................................. 79

COUNT I
Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A) Against all Defendants ................ 79

COUNT II
Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B) Against all Defendants ................. 81

COUNT III
Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(D) Against All Defendants .............. 82

COUNT IV
Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G) Against All Defendants .............. 84

COUNT V
Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)  Against all Defendants .............. 85

COUNT VI
North Carolina False Claims Act,
N.C. Gen. Stat. §§ 1-607 (a)(1)-(a)(4), 1-607 (a)(7) Against All Defendants ................. 86

COUNT VII
California False Claims Act,
Cal. Govt. Code §§ 12651 (a)(1)- (a)(4), 12651 (a)(7)-(a)(8)
Against All Defendants ..................................................................................... 89

COUNT VIII
Delaware False Claims Act,
Del. Code Ann. Tit. 6,§§ 1201 (a)(1)-(a)(4), 1201(a)(7) Against All Defendants ........... 92

COUNT IX
District of Columbia False Claims Act,
D.C. Code Ann. §§ 2-308.14 (a)(1)-(a)(4), 2-308.14 (a)(7)-(a)(8)
Against All Defendants ..................................................................................... 94

COUNT X
Florida False Claims Act,
Fla. Stat. Ann. §§ 68.081 (2)(a)-(2)(d), 68.081 (2)(g)
Against All Defendants ................................................................................................. 96

COUNT XI
Hawaii False Claims Act,
Haw. Rev. Stat. §§ 661-21 (a)(1)-(a)(4), 661-21 (a)(7)-(a)(8)
Against All Defendants ................................................................................................. 99

COUNT XII
Illinois Whistleblower Reward and Protection Act,
740 Ill. Comp. Stat. §§ 175/3 (a)(1)-(a)(4),  175/3 (a)-(7) Against All Defendants ....... 101

COUNT XIII
Indiana False Claims and Whistleblower Protection Act,
Ind. Code §§ 5-11-5.5-2(b)(1)-(b)(4),  5-11-5.5-2(b)(7) Against All Defendants .......... 103

COUNT XIV
Massachusetts False Claims Act,
Mass. Ann. Laws Ch. 12, §§ 5(B)(1)-(B)(4), 5(B)(8) Against All Defendants .............. 106

COUNT XV
Minnesota False Claims Act,
Minn. Stat. §§ 15C.02(a)(1)-(a)(4), 15C.02(a)(7)
Against All Defendants ................................................................................................. 108

COUNT XVI
Montana False Claims Act,
Mont. Code Ann. §§ 17-8-403(1)(a)-(1)(d), 17-8-403(1)(g)-(h)  Against All Defendants
................................................................................................................................. 111

COUNT XVII
Nevada False Claims Act,
Nev. Rev. Stat. §§ 357.040 (1)(a)- (1)(d), 357.040 (1)(g)-(1)(h)
Against All Defendants ................................................................................................. 113

COUNT XVIII
New Hampshire False Claims Act,
N.H. Rev. Stat. Ann. § 167:61-b (I)(a)-(I)(f)  Against All Defendants ......................... 115

COUNT XIX
New Jersey False Claims Act,
N.J. Stat. §§ 2A:32 C-3 (a)- (d); 2A:32 C-3 (g)  Against All Defendants ..................... 118

iv

COUNT XX
New Mexico False Claims Act,
N.M. Stat. Ann. §§ 27-14-3 (A)(1)-(A)(4), 27-14-3 (A)(7)-(A)(8)
Against All Defendants ................................................................................................ 120

COUNT XXI
New York False Claims Act, N.Y. State Fin. L. §§ 189.1.(a)-1.(d), 189.1.(g)
Against All Defendants ................................................................................................ 123

COUNT XXII
Rhode Island False Claims Act,
R.I. Gen. Laws §§ 9-1.1-3(a)(1)-(a)(4), 9-1.1-3(a)(7) Against All Defendants ............. 125

COUNT XXIII
Virginia Fraud Against Taxpayers Act,
Va. Code Ann. §§ 8.01-216.3 (A)(1)- (A-4), 8.01-216.3 (A)(7)
Against All Defendants ................................................................................................ 127

COUNT XXIV
City of Chicago False Claims Act,
Chicago Code of Ordinances §§ 1-22-020(1)-(4), 1-22-020(7)
Against All Defendants ................................................................................................ 130

COUNT XXV
New York City False Claims Act,
NYC Admin. Code §§ 7-803 (a) (1)- (a)(4), 7-803 (a)(7)
Against All Defendants ................................................................................................ 132

X.  PRAYER FOR RELIEF ................................................................................. 134

XI.  REQUEST FOR A TRIAL BY JURY ............................................................ 135

Plaintiff/Relator Lynn E. Szymoniak ("Relator"), by and through her attorneys, Richard A. Harpootlian P.A., Grant & Eisenhofer P.A., and Janet, Jenner & Suggs, LLC, files this amended complaint against Defendants and alleges as follows:

## I.    INTRODUCTION

1.      According to the U.S. Securities and Exchange Commission ("SEC"): "Mortgage-backed securities ["MBS"] are debt obligations that represent claims to the cash flows from pools of mortgage loans, most commonly on residential property. Mortgage loans are purchased from banks, mortgage companies, and other originators and then assembled into pools by a governmental, quasi-governmental, or private entity. The entity then issues securities that represent claims on the principal and interest payments made by borrowers on the loans in the pool, a process known as securitization." SEC, "Mortgage-Backed Securities" (June 25, 2007) (http://www.sec.gov/answers/mortgagesecurities.htm).

2.      The defendants named herein are: (i) trustees which controlled the MBS trusts whose assets consisted of pools of residential mortgages in South Carolina and throughout the United States, and (ii) the mortgage servicing companies that managed the day-to-day operations of the payment processing and foreclosure proceedings at the direction of the trustee banks.

3.      The defendants concealed that the notes and the assignments were never delivered to the MBS trusts and disseminated false and misleading statements to the investors, including the U.S. government and the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island,  Virginia, District of Columbia, the City of Chicago and the City of New York.

1

4.     The U.S. government and the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island,  Virginia, District of Columbia, the City of Chicago and the City of New York  financed the purchase of the MBS that used the defendants as trustees or servicers, and are missing assignments, or include forged assignments.  The U.S. government and the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York are harmed by: (i) the resulting impaired value of the purchased securities, (ii) overcharges for fraudulent services and for services not provided imposed by the trustees and the mortgage servicing companies, and (iii) the increased costs to prove good title to the mortgages purportedly in their MBS' asset pools, since the supporting documents are missing or forged.  The U.S. Government is further harmed by payments made on mortgage guarantees to Defendants lacking valid notes and assignments of mortgages who were not entitled to demand or receive said payments.

5.     Pursuant to the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*[1] (the "FCA") and similar provisions of the State False Claims Acts, the Chicago False Claims Act, and the New York City False Claims Act, Relator seeks to recover, on behalf of the United States of America, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of

---

[1] This action is brought pursuant to both the FCA as it stood prior to the enactment of the Fraud Enforcement and Recovery Act of 2009 (the "FERA") and the FCA, as amended by the FERA.

Columbia, the City of Chicago and the City of New York, damages and civil penalties arising from the sale by Defendants of MBS, and other forms of asset-backed securities, using funds provided by the United States ("U.S.") government and the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York.

6.     Relator conducted her own investigations in furtherance of a False Claims Act *qui tam* action and found that the Defendants pursued and continue to pursue foreclosure actions using false and fabricated documents, particularly mortgage assignments.  The Defendants used robo-signers who signed thousands of documents each week with no review nor any knowledge of their contents and created forged mortgage assignments using fraudulent titles in order to proceed with foreclosures.  The Defendants used these fraudulent mortgage assignments to conceal that over 1400 MBS trusts, each with mortgages valued at over $1 billion, are missing critical documents, namely, the mortgage assignments that were required to have been delivered to the trusts at the inception of the trust.  Without lawfully executed mortgage assignments, the value of the mortgages and notes held by the trusts is impaired because effective assignments are necessary for the trust to foreclose on its assets in the event of mortgage defaults and because the trusts do not hold good title to the loans and mortgages that investors have been told secure the notes.  When the trustee banks discovered that the mortgage assignments were missing, the trustee banks, together with an associated servicing company, default management company and/or mortgage loan documentation company,

devised and operated a scheme to replace the missing assignments with fraudulent, fabricated assignments. The purpose of this scheme was to meet the evidentiary requirements imposed by courts in the foreclosure cases, and to conceal from trust certificateholders the true, impaired value of the assets of each of the trusts, crippled by the missing assignments and related documents.

7. The fraud carried out by the Defendants in this case includes, *inter alia*:

- Mortgage assignments with forged signatures of the individuals signing on behalf of the grantors, and forged signatures of the witnesses and the notaries;

- Mortgage assignments with signatures of individuals signing as corporate officers for banks and mortgage companies that never employed them;

- Mortgage assignments prepared and signed by individuals as corporate officers of mortgage companies that had been dissolved by bankruptcy years prior to the assignment;

- Mortgage assignments prepared with purported effective dates unrelated to the date of any actual or attempted transfer (and in the case of trusts, years after the closing date of the trusts);

- Mortgage assignments prepared on behalf of grantors who had never themselves acquired ownership of the mortgages and notes by a valid transfer, including numerous such assignments where the grantor was identified as "Bogus Assignee for Intervening Assignments;" and

- Mortgage assignments notarized by notaries who never witnessed the signatures that they notarized.

8. The MBS Trusts and their trustees, depositors and servicing companies further misrepresented to the public the assets of the Trusts and issued false statements in their prospectuses and certifications of compliance.

## II.     JURISDICTION AND VENUE

9.      The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the counts related to the State False Claim Act pursuant to 28 U.S.C. § 1367.

10.      This Court has personal jurisdiction over the Defendants pursuant to subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) because Defendants transact the business that is the subject matter of this lawsuit in the District of South Carolina and numerous acts proscribed by 31 U.S.C. § 3729 occurred in the District of South Carolina.

11.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact the business that is the subject matter of this lawsuit in the District of South Carolina and numerous acts proscribed by 31 U.S.C. § 3729 occurred in the District of South Carolina.

## III.     PARTIES

### A.     Relator

12.      Relator Lynn E. Szymoniak brings this action on behalf of herself and the federal government pursuant to 31 U.S.C. §§ 3729-3733 and on behalf of the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia, pursuant to their respective State False Claims Acts as indicated herein, and the City of Chicago and the City of New York pursuant to the respective False Claims Acts as indicated herein.

13. Relator is an attorney specializing in white collar fraud in Palm Beach County, Florida. Relator resides and works in Palm Beach Gardens, Florida. Relator has direct and personal knowledge of the fraudulent scheme described herein. .

**B. Defendants**

14. Defendant AMERICAN HOME MORTGAGE SERVICING, INC. ("AHMS") is a corporation formed under the laws of the State of Delaware. AHMS operates service centers in Irvine, California, Jacksonville, Florida, and Pune, India. AHMS' corporate headquarters is located at 1525 South Beltline Road, Coppell, Texas.

15. Defendant SAXON MORTGAGE SERVICES, INC. ("SAXON") is a corporation formed under the laws of the State of Delaware. SAXON's corporate headquarters is located at 4708 Mercantile Drive, Fort Worth, Texas.

16. Defendant LENDER PROCESSING SERVICES, INC. ("LPS") is a corporation formed under the laws of the State of Delaware. LPS' corporate headquarters is located at 601 Riverside Avenue, Jacksonville, Florida.

17. Defendant DOCX, LLC ("DOCX") is a limited liability company formed under the laws of the State of Georgia. DOCX is a subsidiary of LPS. DOCX's principal place of business is located at 601 Riverside Avenue, Jacksonville, Florida.

18. Defendant AMC MORTGAGE SERVICES, INC., is a corporation formed under the laws of the State of Delaware. Prior to August 31, 2007, AMC MORTGAGE SERVICES was a subsidiary of ACC Capital Holdings Corporation, based in Orange, California, but on that date was sold to Citigroup and renamed CITI RESIDENTIAL LENDING, INC.. In 2009 and 2010, CITI RESIDENTIAL LENDING, INC., was merged into CITIMORTGAGE, INC. ("AMC/CITI"). Defendants CITI RESIDENTIAL LENDING, INC., and CITIMORTGAGE, INC., are both corporations formed under the

laws of the State of Delaware, and are both subsidiaries of CITIGROUP, INC., based in New York, New York. AMC/CITI's corporate headquarters is located at 1000 Technology Drive, O'Fallon, Missouri.

19. Defendant WELLS FARGO HOME MORTGAGE, INC. d/b/a AMERICA'S SERVICING COMPANY ("WELLS/ASC") is a corporation formed under the laws of the State of Delaware. WELLS/ASC is a division of defendant WELLS FARGO BANK, NATIONAL ASSOCIATION, which is a subsidiary of WELLS FARGO & COMPANY, with a corporate headquarters in San Francisco, California. WELLS/ASC's corporate headquarters is located at 3476 Stateview Boulevard, Fort Mill, South Carolina.

20. Defendant BANK OF AMERICA CORPORATION ("BA") is a corporation formed under the laws of the State of Delaware. BA's corporate headquarters is located at Bank of America Corporate Center, 100 North Tryon Street, Charlotte, North Carolina. BA is successor-in-interest to LaSalle Bank.

21. Defendant THE BANK OF NEW YORK MELLON CORPORATION ("BONY") is a national bank. BONY's corporate headquarters is located at One Wall Street, New York, New York.

22. Defendant CITIBANK NATIONAL ASSOCIATION ("CITIBANK") is a national bank. CITIBANK is a subsidiary of CITIGROUP, INC., based in New York, New York. CITIBANK's corporate headquarters is located at 388 Greenwich Street, 14th Floor, New York, New York.

23. Defendant DEUTSCHE BANK NATIONAL TRUST COMPANY ("DBNTC") is a trust company. DBNTC is a subsidiary of DEUTSCHE BANK AG,

with a corporate headquarters in Frankfurt, Germany.  DBNTC's corporate headquarters is located at 60 Wall Street, New York, New York.

24.     Defendant DEUTSCHE BANK TRUST COMPANY AMERICAS ("DBTCA") is a trust company.  DBTCA is a subsidiary of DEUTSCHE BANK AG, with a corporate headquarters in Frankfurt, Germany.  DBTCA's corporate headquarters is located at 60 Wall Street, New York, New York.

25.     Defendant HSBC BANK USA, NATIONAL ASSOCIATION ("HSBC"), is a national bank.  HSBC is a subsidiary of HSBC USA, INC., which, in turn, is a subsidiary of HSBC NORTH AMERICA HOLDINGS, INC..  HSBC HOLDINGS PLC, based in London, England, is the parent company of HSBC NORTH AMERICA HOLDINGS, INC..  HSBC's corporate headquarters is located at 1800 Tysons Boulevard, McLean, Virginia.

26.     Defendant JP MORGAN CHASE BANK, NATIONAL ASSOCIATION ("CHASE") is a national bank.  CHASE is a subsidiary of JP MORGAN CHASE & CO..  CHASE's headquarters is located at 270 Park Avenue, New York, New York.

27.     Defendant U.S. BANK NATIONAL ASSOCIATION ("U.S. BANK") is a national bank.  U.S. BANK is a subsidiary of U.S. BANCORP.  U.S. BANK's corporate headquarters is located at U.S. Bancorp Center, 800 Nicollet Mall, Minneapolis, Minnesota.

28.     Defendant WELLS FARGO BANK, NATIONAL ASSOCIATION ("WELLS FARGO") is a national bank.  WELLS FARGO is a subsidiary of WELLS FARGO & COMPANY, with corporate headquarters in San Francisco, California.

WELLS FARGO's corporate headquarters is located at 101 North Phillips Avenue, Sioux Falls, South Dakota.

29.     The defendants AHMS, SAXON, LPS, DOCX, AMC/CITI AND WELLS/ASC, are collectively referred to herein as the "Mortgage Foreclosure Servicing Defendants."  The defendants BA, BONY, CITIBANK, DBNTC, DBTCA, HSBC, CHASE, U.S. BANK, and WELLS FARGO, are collectively referred to herein as the "Trustee Bank Defendants."  All of the defendants are collectively referred to herein as the "Defendants."

IV.     **BACKGROUND**

     **A.     Real Estate Sale, Mortgage Finance and Foreclosure Procedures**

30.     This case began with Relator's purchase of a home in Florida financed with a mortgage followed by a subsequent foreclosure case based on forged documents. Relator's investigations revealed that Defendants' practices in a specific case occurred in numerous other cases, and tainted foreclosures in South Carolina and nationwide.

31.     Generally, to finance the purchase and sale of real estate, the buyer borrows money from a bank or mortgage company.  The procedure to loan money to a person to buy a home, and record the loan as a lien against the home, relies on a promissory note secured by a mortgage.  The note and mortgage are signed by the buyer of the home, who is the borrower, and by an officer of the bank or mortgage company which originates the loan, *i.e.*, the lender.

32.     The lender records the mortgage as a lien against the property by filing a copy with the county recorder's office in the county in which the property is located. Any assignment of a note and mortgage from the lender to a purchaser is attested simply by the signatures of the parties involved, which are often notarized or witnessed.

33.     A subsequent purchaser traditionally records its ownership of the note and mortgage by filing the assignment with the county recorder's office.  But in the case of the mortgage-backed securities trusts, recording of the assignments rarely occurred.

34.     If the borrower defaults on the payments, the lender, or a new owner of the note and mortgage, can bring a foreclosure action in state court to obtain a court order for the auction of the property, and in this manner can receive payment on the loan by sale of the asset.  In a foreclosure lawsuit, the plaintiff must prove that the property is subject to a note and mortgage, the plaintiff is the entity that lawfully owns the note and mortgage, and a default by non-payment occurred.

**B.     Relator's Mortgage**

35.     On or about April 30, 1998, Relator acquired a home on real property located at the address of 8268 Man O War Road, Palm Beach Gardens, Florida (the "Property").  Relator paid Three hundred ninety-two thousand eight hundred dollars ($392,800) for the Property with a mortgage in the amount of Three hundred fourteen thousand two hundred and no/100 dollars ($314,200).

36.     On February 3, 2006, Relator refinanced her mortgage in the principal amount of  Seven hundred eighty thousand dollars ($780,000) ("Relator's Mortgage"). The lender was OPTION ONE.  The lender's appraiser determined that the fair market value of the Property was approximately One million three hundred thousand dollars ($1.3 million).

37.     In 2009, the appraised value of Relator's home was Five hundred twenty-three thousand eight hundred fifty-three dollars ($523,853), according to the Palm Beach County Appraiser's Office Web site.

10

38.     In accordance with the terms of the note, Relator made monthly mortgage payments of Four thousand eight hundred two dollars and 59/100 ($4,802.59) to OPTION ONE from February 2006 through April 2008.

39.     Relator's Mortgage was an adjustable rate mortgage.  Pursuant to its terms, the rate could adjust only on the first day of March 2008, and on the first day of the month every six months thereafter, provided the mortgage company gave written notice of the adjustment.

40.     OPTION ONE did not adjust the interest rate on Relator's Mortgage on March 1, 2008.  Instead, in violation of the terms of the note, on March 31, 2008, OPTION ONE raised the rate to 8.125%, thus increasing the monthly payment to Five thousand seven hundred forty dollars and 65/100 ($5,740.65).

41.     Relator promptly disputed the adjustment as a violation of the terms of the note but  OPTION ONE never responded.  On April 25, 2008, under protest and to advance negotiations, Relator made one payment at the higher rate, including a disputed late charge of Three hundred forty-four and 44/100 ($344.44) incorrectly imposed by OPTION ONE, for a total payment of Six thousand eighty-five and 9/100 ($6,085.09). Through July 2008, Relator continued to dispute with OPTION ONE the increased rate, but to no avail.

**C.     Foreclosure Proceedings Against Relator**

42.     In July 2008, without any prior notice, a real property foreclosure action was filed against Relator, titled, DBNTC as Trustee for the Certificateholders of Soundview Home Loan Trust 2006-OPT2, Asset-backed Certificates, Series 2006-OPT2 v. Lynn Szymoniak, case number 50-2008-ca-022258 (Circuit Court, Palm Beach County, Florida)("Relator's Foreclosure"), to foreclose on the Property.

43.     The action was commenced by DBNTC. DBNTC's complaint alleged that DBNTC owned the note originally made to OPTION ONE on February 3, 2006, for $780,000; that it had possession of the note at some time, but that the original note was lost or destroyed, "the exact time and manner of said loss or destruction being unknown" but that it was entitled to enforce the original note; and that Relator was in default. As of February 2011, Relator's Foreclosure remains pending.

44.     In Relator's Foreclosure, DBNTC attached to the complaint a copy of the original mortgage to OPTION ONE, but did not attach any documents that proved that a mortgage-backed securities trust had acquired Relator's Mortgage, nor did it make any specific allegations regarding the acquisition of the note and mortgage by DBNTC. The Relator first learned that Relator's Mortgage had allegedly been acquired by Soundview Home Loan Trust 2006-OPT2 ("Soundview Trust") when she was served with the complaint for foreclosure. DBNTC's complaint alleges that DBNTC acts as the trustee for the Soundview Trust.

45.     Soundview Trusts' prospectus, disseminated to the investors, represented that it held good title to the mortgages bundled into the mortgage-backed securities, including Relator's Mortgage, and that it possessed the executed assignments transferring the notes and mortgages from the originating lender to the Soundview Trust.

46.     In reality, Soundview Trust did not hold the original assignments of the notes and mortgages.

**D.      Relator Discovers a Forged Mortgage Assignment Filed in Her Foreclosure by DBNTC**

47.     After the filing of Relator's Foreclosure, in August 2008 Relator's attorney in that action filed a Motion to Dismiss, based on DBNTC's lack of standing

because DBNTC did not possess any title to Relator's note or mortgage. No assignment was produced, or filed and recorded. Indeed, DBNTC alleged that the mortgage and promissory note had been lost or destroyed in an unknown manner.

48.     To cure the deficiencies of its initial allegations, in December 2009, DBNTC, through its attorneys, the Law Offices of Marshall C. Watson, P.A., filed in Relator's Foreclosure a Notice of Filing, attaching copies of three allegedly *bona fide* documents, as follows: (1) a copy of the note (previously alleged to have been lost or destroyed); (2) an allonge;[2] and (3) a mortgage assignment. The mortgage assignment document DBNTC filed with the Circuit Court is a forgery.

49.     Relator discovered the forgery upon inspection and analysis and through her own investigations. First, the document, entitled, "Assignment of Mortgage," bears an execution date of October 28, 2008, months after the filing of Relator's Foreclosure. The grantor is "American Home Mortgage Servicing Inc. as successor-in-interest to Option One Mortgage Corporation," and the grantee is "Deutsche Bank National Trust Company as Trustee for the Certificateholders of Soundview Home Loan Trust 2006-OPT2, Asset-backed Certificates, Series 2006-OPT2." Two individuals, Linda Green and Jessica Ohde, each sign as "vice president" of "American Home Mortgage Servicing Inc. as successor-in-interest to Option One Mortgage Corporation." Two individuals, Korrell Harp and Christina Huang, sign as witnesses. As described below, Relator's investigation showed that Linda Green and Jessica Ohde were not employed by American Home Mortgage Servicing, Inc., and did not have any authority whatsoever to sign the

---

[2] An "allonge" is defined as "[a] piece of paper annexed to a bill of exchange or promissory note, on which to write endorsements for which there is no room on the instrument itself." BLACK'S LAW DICTIONARY 70 (5th ed. 1979).

document. Instead, they were employees of defendant LPS, or its subsidiary, defendant DOCX, and were part of a larger team, who were producing a vast number of forged mortgage assignments for use in foreclosure cases across the United States. The purported signatures of Linda Green and Jessica Ohde on the mortgage assignment submitted in Relator's Foreclosure were likely made by various other people, as Relator's comparison of their various forged mortgage assignments makes clear. The purported witness signatures were also forged, Relator's analysis shows.

50. Affixing or submitting false signatures on a mortgage document is a violation of federal and state law, and those signatures are without authority to complete the transaction. According to a mortgage fraud notice prepared jointly by the Federal Bureau of Investigation and the Mortgage Bankers Association, submitting false mortgage assignments and forging signatures violates potentially eight federal criminal statutes. Specifically: (1) 18 U.S.C. § 1001 - Statements or entries generally; (2) 18 U.S.C. § 1010 - HUD and Federal Housing Administration transactions; (3) 18 U.S.C. § 1014 - Loan and credit applications generally; (4) 18 U.S.C. § 1028 - Fraud and related activity in connection with identification documents; (5) 18 U.S.C. § 1341 - Frauds and swindles by mail; (6) 18 U.S.C. § 1342 - Fictitious name or address; (7) 18 U.S.C. § 1343 - Fraud by wire; and (8) 18 U.S.C. § 1344 - Bank Fraud. *See* FBI Mortgage Fraud Notice (*available at* http://www.mbaa.org/FBIMortgageFraudWarning.htm); s*ee, also,* Truth in Lending Act, title I of the Consumer Credit Protection Act, as amended, 15 U.S.C. § 1601 *et seq.*; Florida Statutes 817.545, Mortgage fraud (penalty is a felony of the third degree).

51.     False or fraudulent notary acknowledgements are also a violation of Florida law, and the underlying signature is void.  Florida Statute 117.05, False or fraudulent acknowledgements (penalty is a felony of the third degree).  South Carolina has corresponding Statute, as explained in detail below.

52.     The signatures contained on the assignments filed in Relator's Foreclosure are fraudulent, in violation of federal and Florida law, and do not serve to assign the note and mortgage to DBNTC.  Therefore, DBNTC lacks any authority to act on Relator's note and mortgage, is not a true party in interest in Relator's Foreclosure, and cannot prosecute the foreclosure.

53.     Even if DBNTC believes it owns Relator's Mortgage, in Relator's Foreclosure DBNTC may prove unable to establish title or will expend significant funds in an effort to prove its allegations that it is the lawful owner of Relator's Mortgage since DBNTC lacks any supporting documents.  The amount DBNTC will expend to prove its ownership is materially more than DBNTC would have spent if it had complied with the procedures described in the Soundview Trust prospectus, or had presented truthful documents to the Circuit Court in Relator's Foreclosure.

54.     As in a single case, the cost for DBNTC to establish it is the owner of Relator's Mortgage is a financial harm for the owners of the Soundview Trust securities, so, too, more widely, in foreclosure cases in South Carolina around the United States the costs to foreclose are higher without any supporting documents.  In each foreclosure case, the U.S. government and the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia,

the City of Chicago and the City of New York, as purchasers of MBS with missing or forged assignments, are financially harmed by the impaired value of the securities that they purchased and by the Defendant Trustee Banks' inability, or excessive expenditures, to prove good title to the mortgages purportedly in their MBS' asset pools, since the supporting documents are missing or forged.

55.     Through her investigations Relator uncovered a wide spread pattern and practice of forging documents. Relator's investigation was prompted as a result of defending her own foreclosure.

56.     In each of the cases involving fraudulent mortgage assignments, the mortgage servicing company was or is defendant AHMS, AMC/CITI, WELLS/ASC or SAXON, and the mortgage default management company was or is defendant LPS.

57.     Since at least 2007, Defendants have known of the significant and serious problems in the Missing Mortgage Assignments Trusts ("MMA Trusts"), but have failed to disclose these problems and, instead, have actively concealed these problems from the SEC, and all investors, including the Treasury, the Federal Reserve Bank, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York.

**E.      Relator Reports Discovery of Mortgage Assignment Fraud to Authorities**

58.     In December 2009, Relator began reporting her findings of widespread fabricated mortgage assignments used by mortgage-backed securities trusts to the: (1) Federal Deposit Insurance Corporation; (2) U.S. House of Representatives, Financial

16

Oversight Committee, and its Housing and Community Opportunity Subcommittee; (3) Financial Crisis Oversight Commission; (4) U.S. Attorney for the Middle District of Florida; (5) State Attorney for Palm Beach County, Florida; and (6) various Florida Court Clerks, among others.

59.     Upon information and belief, Relator's findings communicated to the FBI Special Agent in Jacksonville, Florida resulted in an investigation.

## V.      THE MORTGAGE-BACKED SECURITIES MARKET

### A.      Mortgage-backed Securities Trusts and the Trustees' Role

60.     Although relatively unknown and unused prior to 2004, MBS trusts held approximately one-third of all residential mortgages in the United States by the end of 2009.

61.     Such trusts hold a pool of approximately 5,000 residential mortgages, with notes, with a stated value of $1.5 to $2.5 billion in each trust.

62.     These trusts are each governed by Pooling & Servicing Agreements establishing the duties of various entities involved in the creation and operation of the trust.

63.     One of the most significant duties of the trustee is the conveyance of the mortgages and notes from the original lenders to the depositor, then to the trust.  This conveyance is done via mortgage assignments.

64.     The trusts represent to purchasers of their securities that the notes and mortgages (bundled to form the asset pool of the trust) will be delivered with assignments to the trust in recordable form, so that they will be able to foreclose on the assets in the event of default.

65. Despite the trusts' representations, in many trusts the assignments of the notes and mortgages were not delivered at all to the trustee or, if delivered, were allegedly lost or misplaced.

66. The trustees, the servicers and the depositors of the MBS Trusts routinely provided certification of compliance, and falsely alleged that they had fulfilled their obligations as mandated by the Securities and Exchange Commission ("SEC") Regulation AB and by the prospectuses and pooling and servicing agreements.

67. Without the assignments, the value of the assets in the trust is severely diminished because the trustee is unable to establish clear chain-of-title to pursue a foreclosure action. The trust usually turned to a "lost note affidavit" procedure to assert ownership. Faced with an increasing number of inaccuracies in foreclosure cases, courts have increasingly established minimum evidentiary standards requiring more than a lost note affidavit. Rather than pursuing the proper procedure for obtaining valid assignments, the Defendants have filed forged mortgage assignments in court to support their foreclosure cases.

**B. Mortgage-backed Securities Trusts, Controlled by the Trustee Bank Defendants Allegedly Purchased Notes and Mortgages on Homes in South Carolina and Across the United States**

68. The MBS trusts, controlled by the Trustee Bank Defendants were created, packaged and sold between 2004 and 2009, during the rapid expansion of the MBS industry.

69. Relator's investigations revealed that between 2004 and 2009, the MBS trusts, controlled by the Trustee Bank Defendants, allegedly acquired notes and mortgages for homes in South Carolina, and across the United States.

70.     Notes and mortgages on homes located in South Carolina are identified as assets in the prospectus of the MBS trusts controlled by the Trustee Bank Defendants. The prospectus specifies the location by state of the homes subject to the notes and mortgages acquired by the trusts and includes properties for which foreclosures with forged assignments are pending.  For example, South Carolina properties are included in a MBS created in 2004, entitled "American Home Mortgage Investment Trust 2004-4", among the forged assignments , with defendant BONY as the trustee.  A review of the prospectus further shows that this MBS contains a total of 341 South Carolina homes, with a principal aggregate value of $52 million, as illustrated in Table 1, below.  All of these filings, including the forging of mortgage assignments to the American Home Mortgage Investment Trust 2004-4, show that Defendants' fraudulent practices spread widely in South Carolina.

Table 1.  South Carolina Homes Controlled by Defendant BONY in the American Home
           Mortgage Investment Trust 2004-4

| Group No. | No. Mortgages in S.C. | Principal Value |
|-----------|----------------------|-----------------|
| Group I | 27 | $6,925,746.82 |
| Group II | 56 | $8,264,377.00 |
| Group III | 12 | $8,802,181.56 |
| Group IV | 91 | $12,874,666.42 |
| Group V | 6 | $2,984,900.00 |
| Group VI | 77 | $9,159,103.53 |
| Group VII | 72 | $3,249,689.06 |
| **TOTAL** | **341** | **$52,260,664.39** |

*Source*: Prospectus of American Home Mortgage Investment Trust 2004-4, Prospectus Supplement dated December 17, 2004, tables entitled, "Geographic distribution of the mortgage properties," entries for S.C.: Group I, at 4; Group II, at 12; Group III, at 23; Group IV, at 32; Group V, at 42; Group VI, at 64; and Group VII, at 72, SEC Form 424B5 (filed Dec. 22, 2004).

**C.      The Foreclosure Problem in South Carolina and the United States**

71.      The foreclosure problem in South Carolina, and the United States, is substantial.  As of February 2010, South Carolina has 3,114 homes reportedly in foreclosure, an increase of 26% from a year ago.

72.      As of December 31, 2009, South Carolina has 2.53% of its so-called "prime mortgages" in foreclosure, ranking 16th nationally, according to figures compiled by the Richmond office of the Federal Reserve Bank.  Among riskier, subprime mortgages in South Carolina, 11.32% were in foreclosure, which ranks 28th nationally. Lisa Hearl *et al*., "Quarterly Report: Housing Market and Mortgage Performance in Maryland and the District of Columbia," The Federal Reserve Bank of Richmond, at 8 (April 2010) (http://www.richmondfed.org/community_development/resource_centers/foreclosure/rese arch_and_pubs/mortgage_performance_summaries/md_dc/pdf/mortgage_performance_m ddc_20094q.pdf).

73.      According to data compiled by the Federal Reserve Bank of Richmond, in the third quarter of 2010 subprime mortgages continued to make up 28 percent of the foreclosure inventory in South Carolina.  South Carolina is ranked 18th in the nation in its share of subprime loans.

http://www.richmondfed.org/community_development/resource_centers/foreclosure/rese arch_and_pubs/mortgage_performance_summaries/sc/pdf/mortgage_performance_sc_20 103q.pdf

74.      The problems in South Carolina reflect a national trend.  In the most recent quarter, a record number of foreclosures has occurred in the United States.  On May 10, 2010, *Bloomberg* reported: "Bank repossessions in the U.S. rose 35 percent in

20

the first quarter from a year earlier to a record 257,944, according to RealtyTrac Inc."
Brian Louis, "Mortgage Holders Owing More Than Homes Are Worth Rise to 23%,"
*Bloomberg*, May 10, 2010 (http://www.bloomberg.com/apps/news?pid= newsarchive
&sid=all DMOrP8m3M).

75.    The size of the foreclosure problem is growing, with "the 1.8 million
foreclosures already tallied in the first half of this year by Equifax and Moody's
Economy.com, and by projections for 3 million to 4 million foreclosures over two years."
Elise Craig, "Mortgage Modifications Can't Catch Foreclosures," *BusinessWeek*, Aug. 4,
2009 (http://www.businessweek.com/bwdaily/dnflash/content/
aug2009/db2009084_229370.htm).

76.    Other sources suggest that as many as five to six million homes will end
up in foreclosure beyond the number already seized.  Dan Levy, "U.S. Home Seizures
Reach Record as Recovery Delayed," *Bloomberg*, May 13, 2010 ("About 5 million
delinquent loans will probably end up in the foreclosure process in addition to the 1.2
million homes already taken back by lenders, Sharga said.")
(http://www.bloomberg.com/apps/news?pid=newsarchive&sid=akVDiuetiH5I).

77.    The Federal Reserve Bank of New York states that it "considers the record
rate of mortgage delinquencies, foreclosures and their impacts on communities an urgent
problem." The Federal Reserve Bank of N.Y. (2010)
(http://data.newyorkfed.org/creditconditionsmap/ ).

**D. Defendants' Role in the Foreclosure Actions in the South Carolina Courts and Defendants' Filing of Forged Mortgage Assignments in South Carolina, and Across the United States, Worsening the Foreclosure Problem**

78. The Defendants' illegal activities, conducted in South Carolina and elsewhere, play a significant role in making the foreclosure problem worse in South Carolina, and the United States.

79. *The Mortgage Foreclosure Servicing Defendants (e.g.*, WELLS/ASC, AHMS, SAXON and AMC/CITI) are significant participants in foreclosure actions in the South Carolina courts.

80. Defendant WELLS/ASC primarily services loans for investors, including loans that were packaged into securities and sold by lenders into the secondary market. WELLS/ASC services residential mortgages from across country from its corporate headquarters in Fort Mill, South Carolina, particularly loans that are bundled into MBS trusts and have defendant WELLS FARGO as the trustee. The activity of WELLS/ASC in South Carolina residential foreclosures is so intense that "Wells Fargo Home Mortgage" is named as a party in approximately 700 bankruptcy cases filed in South Carolina as of April 25, 2010, according to court dockets.

81. Likewise, defendant AHMS primarily services loans that are packaged into MBS trusts and have defendant DBNTC as the trustee. Defendant DBNTC is one of the most active plaintiffs in foreclosure cases in South Carolina, and throughout the United States. Defendant DBNTC has such a large presence in the South Carolina mortgage market that it is named as a party in approximately 400 bankruptcy cases filed in South Carolina as of April 25, 2010, according to court dockets.

82.     Additionally, foreclosures in South Carolina were affected by the activities of Saxon Mortgage Servicing, the mortgage servicing division of defendant SAXON. Saxon Mortgage was such a large presence in the South Carolina mortgage market that it is named as a party in approximately 500 bankruptcy cases filed in South Carolina as of April 25, 2010, according to court dockets.

83.     Finally, defendant AMC/CITI (d/b/a AMC Mortgage Servicing, Inc., and then acquired by Citi Residential Lending) was the primary loan servicer for the now defunct Ameriquest Mortgage, Inc..  There are over 17 MBS trusts in the U.S. that are primarily comprised of mortgages made by Ameriquest Mortgage, and that have defendant DBNTC as the trustee.  Both Ameriquest and AMC/CITI were such a large presence in the South Carolina mortgage market that Ameriquest is named as a party in approximately 200 bankruptcy cases, and AMC/CITI is named in approximately 140 bankruptcy cases, filed in South Carolina as of April 25, 2010, according to court dockets.

84.     The Mortgage Foreclosure Servicing Defendants service mortgages in MBS trusts, including thousands of South Carolina properties.  The defendant Trustee Banks serve as trustees for these MBS trusts.

85.     Furthermore, the Defendants all use the default management services provided by defendant LPS to manage loan defaults.  When a homeowner defaults on his or her mortgage, and that mortgage loan has been acquired by a MBS trust, the serving company, acting as an agent of the trust, uses LPS to retain counsel and oversee litigation, and to provide documents necessary for foreclosing.  Defendant LPS has retained attorneys to file foreclosures in the South Carolina courts, and in courts

23

nationwide, and has directed their attorneys to file forged documents in those foreclosure cases.  More than 100 forged mortgage assignments were prepared by LPS and recorded in South Carolina for the purposes of foreclosure**.**

86.     In the 2009 Annual Report, Form 10-K filed with the SEC on February 23, 2010, LPS represents that its services are used by a majority of the 50 largest banks in the United States.  Its technology solutions include its mortgage processing system which processes over 50% of all residential mortgages by dollar volume.  Its outsourcing services include the "default management services which are used by mortgage lenders and servicers to reduce the expense of managing defaulted loans…."

87.     In the 2009 Annual Report, LPS states in 2009, its two largest customers, defendants WELLS FARGO and CHASE, each accounted for more than 10% of LPS' aggregate revenue and more than 10% of the revenue from each of the Technology, Data and Analytics and Loan Transaction Services segments.  LPS Annual Report for 2009, SEC Form 10-K (filed Feb. 23, 2010), at 5, available at http://www.sec.gov/Archives/edgar/data/1429775/000095012310015599/g22183e10vk.htm.

## VI.     DEFENDANTS' ACTS VIOLATE THE FALSE CLAIMS ACT

88.     Defendants created mortgage-backed securities lacking lawful assignments of the notes and mortgage to the trusts, and then forged the missing assignments by having employees or agents of defendant LPS, on behalf of all the other Defendants, sign using false corporate officer titles, false dates of assignment, and forged signatures.

89.     By 2008, at the latest, the Trustee Bank Defendants knew, or reasonably should have known, that the requisite mortgage assignments were lost, or had never been delivered, for the MBS sold to the U.S. government.

90.     By 2008, at the latest, the Trustee Bank Defendants knew, or reasonably should have known, that foreclosure cases with missing assignments would draw the scrutiny of courts or would not be accepted by the courts, preventing foreclosure, or increasing the costs substantially by requiring document custodian witnesses to testify in court.  The higher procedural costs of the foreclosures is borne by the trusts and thus the value of the trusts' securities is materially diminished.

91.     Rather than disclose that the assignments were missing for many trusts, the Defendants embarked on a plan to forge assignments to comply with the evidentiary standards of the courts in foreclosure cases.

92.     The Trustee Bank Defendants directed the Mortgage Foreclosure Servicing Defendants to prepare and file forged mortgage assignments to replace the missing assignments.

93.     After discovering the forged mortgage assignment in Relator's Foreclosure, Relator investigated approximately more than one thousand mortgage assignments prepared by defendant DOCX and found the same forged assignments in all of these cases.

94.     In her investigation, Relator examined similar assignments prepared in LPS's offices in Dakota County, Minnesota, and in Jacksonville, Florida, and found that the forgeries were also created in these offices.  Ironically, LPS claims on its Web site as follows: "Our full service, integrated solution eliminates errors and delays that can come

from employing multiple title companies, while providing seamless service and consistent quality control throughout the entire default cycle." Relator further examined assignments prepared by certain of the law firms used by LPS in its default management processes and found that, in many cases, the law firm employees were signing as officers of grantors, without any authority or power of attorney, so that certain trusts could foreclose. These assignments, as all the others that Relator had examined, had the same, or similar, false information regarding transfer of ownership to the trust as the assignments prepared in the other offices of LPS. Moreover, Relator found that the law firm employees signed as officers of an industry database, called the Mortgage Electronic Registration Systems, Inc. ("MERS"), without disclosing that they were associates or support staff in the foreclosing law firms.

95. The employees or agents of defendants WELLS/ASC in South Carolina, and LPS, and/or its subsidiary, DOCX, with offices in three states, who participated in the fraudulent assignments mainly recorded in South Carolina , include: (i) the officers based in the State of **SOUTH CAROLINA**: (1) John Kennerty; (2) Nicki Cureton; (3) China Brown; (4) Heather Carrico; (5) Elizabeth Mathis; (6) Anita Antonelli, (7) Natasha Clark, and (8) Joseph Kaminski[3]; (ii) the officers based in **GEORGIA**: (9) Linda Green; (10) Korell Harp; (11) Linda Thoresen; (12) Tywanna Thomas; (13) Jessica Ohde; (14) Brittany Snow; (15) Lorraine O'Reilly Brown; (16) Ron Meharg; (iii) the officers based in **FLORIDA**: (17) Michelle Halyard, (18) Kathy Smith; (19) Cynthia Stevens; (20) Joseph Kaminski; and (iv) the officers based in **MINNESOTA**: (21) Greg Allen; (22) Liquenda Allotey; (23) Alfonzo Greene; (24) Topako Love; (25) Christina Allen; (26)

---

[3] Joseph Kaminski is an employee of LPS based in Jacksonville, FL.

John Cody, (27) Laura Hescott,  (28) Eric Tate, (29) Bethany Hood, (30) Cecilia Knox, (31) Becky North, (32) Jodi Sobotta, (33) Rick Wilken, and others, as detailed below.

96.     Likewise, the employees or agents of defendants AHMS and Saxon Robert Hardman and John Cottrell participated in the fraudulent assignments.

## A.     False Corporate Officer Titles and Forged Signatures

97.     After examining the forged mortgage assignment filed in Relator's own foreclosure, including the signatures of "Linda Green" and "Jessica Ohde," Relator located numerous other examples of assignments signed by those names.  Relator also located other examples of documents signed by the same witnesses, "Korrell Harp" and "Christina Huang."  Indeed, Relator discovered a number of forgeries using the signature of Linda Green, and others.  The results of Relator's investigation are described below.

### 1.     South Carolina

98.     The name "John Kennerty" appears on over one thousand mortgage assignments prepared by America's Servicing Company (*i.e.*, defendant WELLS/ASC) in Fort Mill, South Carolina.  On these assignments, Kennerty signs as an officer of the grantor, but he was, in reality, just an employee of defendant WELLS/ASC, the mortgage servicing company of these grantee trusts.

99.     On WELLS/ASC-prepared mortgage assignments, at least three different job titles are listed for John Kennerty, who also signs using the name, "Herman John Kennerty."  Titles attributed to Kennerty include the following:

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting soley as nominee for Mortgage Network, Inc.;

- VP of Loan Documentation, Wells Fargo Bank, NA Attorney-in-Fact-For-Home 123 Corporation; and

- VP of Loan Documentation, Wells Fargo Bank, NA Attorney-in-Fact-For-New Century Mortgage Corporation.

100.    The use of so many different corporate titles for John Kennerty shows it is unlikely that he was actually the officer of any of the named companies; John Kennerty lacked corporate authority to sign the documents of behalf of the companies.

101.    The assignments signed by Kennerty also contain false dates of assignment.

102.    The name "Nicki Cureton" appears on over one thousand mortgage assignments prepared by defendant WELLS/ASC in Fort Mill, South Carolina.  On these assignments, Cureton signs as an officer of the grantor, but Cureton instead works for WELLS/ASC, the mortgage servicing company of these grantee trusts.  Without any authority, Cureton signs as the officer of the grantor, or as a MERS officer, for at least 10 different mortgage companies.

103.    The use of so many different corporate titles for Nicki Cureton shows it is unlikely that she was actually the officer of any of the named companies; Nicki Cureton lacked corporate authority to sign the documents of behalf of the companies.

104.    The Assignments signed by Cureton also contain false dates of assignment.

105.    The names "China Brown," "Heather Carrico," "Elizabeth Mathis," "Natasha Clark," appear on over one thousand mortgage assignments prepared by defendant WELLS/ASC in Fort Mill, South Carolina.  On these assignments, Brown, Carrico, Mathis or Clark signs as an officer of the grantor, but they are actually employees of WELLS/ASC, the agent mortgage servicing companies of these grantee

trusts.  Without any authority, Brown, Carrico, Mathis or Clark signs as the officer of the grantor, or as a MERS officer, for at least 10 different mortgage companies.

106.    The use of so many different corporate titles for Brown, Carrico, Mathis or Clark shows it is unlikely that they were actually the officer of any of the named companies; Brown, Carrico, Mathis and Clark lacked corporate authority to sign the documents of behalf of the companies.

107.    The Assignments signed by Brown, Carrico, Mathis or Clark also contain false dates of assignment.

108.    The assignments created by defendant WELLS/ASC were prepared and filed only in those cases in which foreclosure was likely, due to the default in payments by the borrower-homeowners.  When the loans went into default, defendants AHMS, SAXON, WELLS/ASC or AMC/CITI hired defendant LPS, who in turn retained law firms.  At the direction of their clients, the law firms submitted to the courts the false and forged documents prepared by LPS and its subsidiary, DOCX.

109.    In South Carolina, for example, the Korn Law Firm was retained by and acted under the direction of LPS.  Employees of the Korn Law Firm signed as officers of an industry database, called the Mortgage Electronic Registration Systems, Inc. ("MERS"), without disclosing that they were associates or support staff in the foreclosing law firms.

110.    The Korn Law firm submitted to the courts forged mortgage assignments prepared by employees at the LPS offices in Dakota County, Minnesota, Alpharetta, Georgia, or Jacksonville, Florida.

### 2. Georgia

111. The name "Linda Green" appears on over 100 mortgage assignments prepared by defendant DOCX and filed throughout the United States, including South Carolina. On these assignments, Green signs as an officer of the grantor but she was, in reality, just an employee of defendant DOCX.

112. On DOCX-prepared mortgage assignments, at least 18 different job titles are listed for Linda Green, with different titles assigned to Green even on the same day. Titles attributed to Green include the following:

- Vice President, Loan Documentation, Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for HLB Mortgage;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for Family Lending Services, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for AIIM Mortgage;

- Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Vice President & Asst. Secretary, American Home Mortgage Servicing, Inc., as servicer for Ameriquest Mortgage Corporation;

- Vice President, Option One Mortgage Corporation;

- Vice President, American Home Mortgage Servicing, Inc.;

- Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Vice President, Argent Mortgage Company, LLC by Citi Residential Lending Inc., attorney-in-fact;

- Vice President, Sand Canyon Corporation f/k/a Option One Mortgage Corporation;

- Vice President of Optimum Mortgage Group LLC by Sand Canyon Corporation f/k/a Option One Mortgage Corporation as Attorney-in-Fact;

- Vice President of Deutsche Bank National Trust Company, as Trustee for the Certificateholders of Soundview Home Loan Trust 2006-OPT1, Asset-Backed Certificates, Series 2006-OPTI;

- Vice President, Amtrust Funsing (sic) Services, Inc., by American Home Mortgage Servicing, Inc. as Attorney-in-fact; and

- Vice President, Seattle Mortgage Company.

113.    The use of so many different corporate titles for Linda Green shows it is unlikely that she was actually the officer of any of the named companies; Linda Green lacked corporate authority to sign the documents of behalf of the companies.

114.    Further, Linda Green did not sign all of the documents to which her name is affixed.  At least eight different persons have signed on the DOCX-prepared assignments.  Likewise, so many people signed mortgage assignment documents using her name, Linda Green, that the notarization of those signatures is clearly unreliable, and fraudulent.

115.    Similarly, the name "Korell Harp" appears on over 100 mortgage assignments prepared by DOCX.  On these assignments, Harp signs as an officer of the grantor.

31

116.     On DOCX-prepared mortgage assignments, at least 14 different job titles are listed for Korell Harp, with different titles assigned to Harp on the same day.  Titles attributed to Harp include the following:

- Vice President, American Brokers Conduit;

- Vice President, American Home Mortgage Acceptance, Inc.;

- Vice President, American Home Mortgage Servicing, Inc.;

- Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Vice President, Option One Mortgage Corporation;

- Vice President & Asst. Secretary, Argent Mortgage Company, LLC by Citi Residential Lending, Inc., as Attorney in Fact;

- Vice President, J.S. Shirk and Associates, Inc. by American Home Mortgage Servicing, Inc., as Attorney-In-Fact;

- Vice President, Mortgage Electronic Registration Systems, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage;
- Vice President, Mortgage Electronic Registration Systems, Inc., acting solely as a nominee for HLB Mortgage; and

- Vice President, Sand Canyon Corporation, f/k/a Option One Mortgage.

117.     The use of so many different corporate titles for Korell Harp shows it is unlikely that he was actually the officer of any of the named companies; Korell Harp lacked corporate authority to sign the documents of behalf of the companies.

118.    Further, Korell Harp did not sign all of the documents to which his name is affixed.  At least five different persons have signed the name Korell Harp on the DOCX-prepared assignments.  Likewise, so many people signed mortgage assignment documents using his name, Korell Harp, that the notarization of those signatures is clearly unreliable, and fraudulent.

119.    The name "Linda Thoresen" appears on over 100 mortgage assignments prepared by DOCX.  On these assignments, Thoresen signs as an officer of the grantor.

120.    On DOCX-prepared mortgage assignments, at least six different job titles are listed for Linda Thoresen, with different titles assigned to Thoresen on the same day.  Titles attributed to Thoresen include the following:

- Asst. Vice President, American Home Mortgage Acceptance, Inc.;

- Asst. Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Asst. Secretary, Mortgage Electronic Registration Systems, Inc.;

- Asst. Secretary, Mortgage Electronic Registration Systems, Inc. as nominee for American Brokers Conduit;

- Asst. Secretary, Mortgage Electronic Registration Systems, Inc. as nominee for American Home Mortgage Acceptance, Inc.; and

- Asst. Vice President, Mortgage Electronic Registration Systems, Inc. acting solely as a nominee for Lenders Direct Capital Corporation.

121.    The use of so many different corporate titles for Linda Thoresen shows it is unlikely that she was actually the officer of any of the named companies; Linda Thoresen lacked corporate authority to sign the documents of behalf of the companies.  .

122.    Further, Linda Thoresen did not sign all of the documents to which her name is affixed.  At least three different persons have signed the name Linda Thoresen on

the DOCX-prepared assignments.  Likewise, so many people signed mortgage assignment documents using her name, Linda Thoresen, that the notarization of those signatures is clearly unreliable, and fraudulent.

123.    The name "Tywanna Thomas" appears on over 100 mortgage assignments prepared by DOCX.  On these assignments, Thomas signs as an officer of the grantor.

124.    On DOCX-prepared mortgage assignments, at least 21 different job titles are listed for Tywanna Thomas, with different titles assigned to Thomas even on the same day.  Titles attributed to Thomas include the following:

- Assistant Vice President, American Home Mortgage;

- Assistant Vice President, American Home Mortgage Acceptance, Inc.;

- Assistant Vice President, American Home Mortgage Servicing, Inc.;

- Vice President & Assistant Secretary, American Home Mortgage Servicing, Inc., as servicer for Ameriquest Mortgage Company;

- Vice President & Assistant Secretary, American Home Mortgage Servicing, Inc., as servicer for Argent Mortgage Company, LLC;

- Assistant Vice President, American Home Mortgage Servicing, Inc as successor-in-interest to Option One Mortgage Corporation;

- Vice President & Assistant Secretary, Argent Mortgage Corporation, LLC by Citi Residential Lending, Inc., as Attorney in Fact;

- Assistant Vice President, Deutsche Bank National Trust Company as Indenture Trustee for American Home Mortgage Investment Trust 2005-2 Mortgage-Backed Notes, Series 2005-2 by American Home Mortgage Servicing, Inc, as Attorney-in Fact;

- Vice President & Assistant Secretary, Inc., as servicer for Deutsche Bank National Trust Company, as trustee for, Ameriquest Mortgage Securities, Inc., asset-backed pass-through certificates, series 2004-R7, under the pooling and servicing agreement dated July 1, 2004;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc.;

34

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for American Home Mortgage;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage Acceptance, Inc.;

- Assistant Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for Family Lending Services, Inc.;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as a nominee for HLB Mortgage;

- Assistant Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for Homestar Mortgage Lending Corp.;

- Assistant Vice President, Mortgage Electronic Registration Systems, Inc., A Separate Corporation that is acting solely as Nominee for Lender and Lender's successors and assigns [Beckman Mortgage Corporation];

- Assistant Vice President, Nationwide Home Loans, Inc, by American Home Mortgage Servicing, Inc., as Attorney-In-Fact;

- Assistant Vice President, Option One Mortgage Corporation;

- Assistant Vice President, Sand Canyon Corporation f/k/a Option One Mortgage Corporation; and

- Assistant Vice President, Wells Fargo Bank, N.A., as Trustee for First Franklin Mortgage Loan Trust 2002-FF1, Asset-Backed Certs., Series 2002-FF1.

125.    The use of so many different corporate titles for Tywanna Thomas shows it is unlikely that she was actually the officer of any of the named companies; Tywanna Thomas lacked corporate authority to sign the documents of behalf of the companies.

126.    Further, Tywanna Thomas did not sign all of the documents to which her name is affixed.  At least three different persons have signed the name Tywanna Thomas on the DOCX-prepared assignments.  Likewise, so many people signed mortgage

assignment documents using her name, Tywanna Thomas, that the notarization of those signatures is clearly unreliable, and fraudulent.

127. The name "Jessica Ohde" appears on over 100 mortgage assignments prepared by DOCX. On these assignments, Ohde signs as an officer of the grantor.

128. On DOCX-prepared mortgage assignments, at least six different job titles are listed for Jessica Ohde, with different titles assigned to Ohde even on the same day. Titles attributed to Ohde include the following:

- Assistant Vice President, American Home Mortgage Servicing, Inc.;

- Assistant Vice President, American Home Mortgage Servicing, Inc., as successor-in-interest to Option One Mortgage Corporation;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as nominees for American Home Mortgage;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as nominees for American Home Mortgage Acceptance, Inc.; and

- Vice President, Seattle Mortgage.

129. The use of so many different corporate titles for Jessica Ohde shows it is unlikely that she was actually the officer of any of the named companies; Jessica Ohde lacked corporate authority to sign the documents of behalf of the companies. .

130. Further, Jessica Ohde did not sign all of the documents to which her name is affixed. At least three different persons have signed the name Jessica Ohde on the DOCX-prepared assignments. Likewise, so many people signed mortgage assignment documents using her name, Jessica Ohde, that the notarization of those signatures is clearly unreliable, and fraudulent.

36

131.     Other individuals who misrepresented themselves to be bank officers or mortgage company officers on mortgage assignments prepared by DOCX, who were actually clerical employees of DOCX, also include: (1) Brent Bagley, (2) Christie Baldwin, (3) Christina Huang and (4) Shelly Scheffey.  There are such significant variations in the signatures of these individuals that it is very likely that some of these signatures were also forged.  So many people signed mortgage assignment documents using those names, the notarization of those signatures is unreliable, and fraudulent.

132.     Many of the mortgage assignments prepared by DOCX have a customer code indicated, in the left-hand corner of the document, under the address information. In over 950 of 1,000 examples reviewed by Relator, the customer code was "AHMA." Upon information and belief, AHMA stands for "American Home Mortgage Acquisition," a company formed by Wilbur Ross in 2007, to acquire the $45 billion servicing unit of American Home Mortgage Investment Corporation when that company filed for bankruptcy.  AMERICAN HOME MORTGAGE SERVICING, INC., was formed in 2008 when Ross acquired the mortgage servicing business from American Home Mortgage Investment Corporation.

133.     A review of the mortgage assignments prepared by DOCX and all notarized during a single day, July 30, 2009, from 13 Florida counties ((1) Broward, (2) Escambia, (3) Hillsborough, (4) Lake, (5) Lee, (6) Marion, (7) Martin, (8) Miami-Dade, (9) Nassau, (10) Osceola, (11) Palm Beach, (12) Sarasota, and (13) St. Lucie) showed that DOCX prepared a high-volume of mortgage assignments for trusts that used AHMS as the mortgage servicer and LPS as the default management company.

134.    These assignments were prepared and filed only in those cases where foreclosure was likely, due to the default in payments by the borrower/homeowners. When the loans went into default, AHMS hired LPS, who in turn retained and supervised the law firms that filed most of the foreclosure actions on behalf of the trusts and used the forged LPS documentation, or assignments fabricated at their law firms, to pursue these foreclosures.  In Florida, for example, five of the largest foreclosure law firms were each retained by, and acted at the direction of LPS: (1) Florida Default Law Group; (2) the Law Offices of Marshall C. Watson, P.A.; (3) the Law Offices of David J. Stern, P.A.; (4) the Law Offices of Daniel C. Consuegra, P.A.; and (5) Shapiro & Fishman, LLP.

135.    Each of the thousands of assignments from July 30, 2009, had the signatures of Linda Green and Tywanna Thomas as officers of the bank or corporation identified on the assignment as the grantor.

136.    On each assignment from July 30, 2009, the signature of Linda Green was witnessed by Dawn Williams and the signature of Tywanna Thomas was witnessed by Christina Huang.

137.    With one exception, each of the assignments prepared on July 30, 2009, was notarized by the same notary, Chris Ivey, in Fulton County, Georgia.

138.    There are three distinct variations of the Linda Green signature on the assignments prepared on July 30, 2009.  In Version 1 of the Linda Green signature, the signature is characterized by a lower case "L" and no discernible "A" in Linda.  In Version 2 of the Linda Green signature, the signature is characterized by traditional cursive letters.  In Version 3 of the Linda Green signature, the signature is characterized by a large loopy "D" in Linda as the largest letter in the signature and a lower case "L."

139.    Likewise, there are two distinct versions of the Tywanna Thomas signature on the assignments prepared on July 30, 2009.  In Version 1 of the Tywanna Thomas signature, the letters are written in lower-case cursive, with a distinct backhand, and only the first letter or the first two letters, "T" or "Th," of the last name are written. In Version 2, the signature has a distinct slant to the right and the Ts resemble printed capital Ts.  Only the first letters of each word are written so that "Tywanna" is written as "Ty" and "Thomas" is written as "T."

140.    The different signature versions correspond to different batch numbers located in the upper left hand corner of the assignments. All of the assignments with Green Signature Version 1 were used on assignments with Batch Number 6647; all of the assignments with Green Signature Version 2 were used on assignments with Batch Number 6643; the assignment, with Linda Green Signature Version 3, had a different Batch Number: 6633.

141.    An examination of the batch numbers and signing dates shows that defendant DOCX produced nearly 1,000 "batches" of mortgage assignments in 2008 and 2009. Examples of dates corresponding to Batch Numbers include the following:

| _Date_ | _/Batch_ | _/ Name / County / State_ |
|---|---|---|

4-1-2008, Batch 1337 Fray, Broward Co, FL
8-13-2008, Batch 1737 Santiago, St. Lucie Co, FL
12-2-2008, Batch 3434 Shrock, Osceola Co, FL
12-29-2008, Batch 3908 Ortiz, South Essex Co, MA
1-14-2009, Batch 4122 Boylan, South Essex Co, MA
1-21-2009, Batch 4220 Pelosi, South Essex Co, MA
2-6-2009,  Batch 4434 Clemons, South Essex Co, MA
2-11-2009, Batch 4483 Sorrentino, South Essex Co, MA
2-17-2009, Batch 4553 Vey, Lee Co, FL
3-16-2009, Batch 4919 Banks, South Essex Co, MA
4-23-2009, Batch 5430 Vioria, South Essex Co, MA
5-15-2009, Batch 5707 Dennis, Queens Co, NY

7-16-2009, Batch 6458 Russoniello, Broward Co, FL
7-24-2009, Batch 6572 Cruz, Clay Co, FL
7-24-2009, Batch 6572 Scheetz, Clay Co, FL
7-24-2009, Batch 6572 Curren, Clay Co, FL
8-12-2009, Batch 6842 Ashton, South Essex Co, MA
8-24-2009, Batch 7131 Quintero, Palm Beach Co, FL
11-13-2009, Batch 9140 Dandreo, South Essex Co, MA
12-1-2009, Batch 9416 Velazquez, Lee Co, FL

142.     The same names (Green, Thomas, Harp, Thoresen, Odhe, and a few others) were used on thousands of forged assignments filed in South Carolina, Arizona, California, Florida, Illinois, Massachusetts, Mississippi, New York and other states in 2008 and 2009. Each of those signatures is likely forged or fraudulent, and the assignments to which they were affixed are also fraudulent and legally invalid. The MBS trustees, which claim ownership of each of these mortgages, will incur significantly higher costs of foreclosure in proving lawful title to the subject property, or will never be able to prove ownership based on forged signatures on assignments to their respective MBS trusts. The resulting financial harm to the investors of the MBS, including the U.S. government, is substantial.

143.     In 2008 and 2009, DOCX prepared and filed over one thousand "batches," with approximately 1,000 assignments in each batch, or nearly one million such assignments. DOCX used numerous DOCX employees to sign these names, and paid notaries to falsely notarize the signatures. DOCX knew, or reasonably should have known, that the notaries had not witnessed the signatures, that various individuals were all claiming to be the same person, and also that the titles that appeared next to the names used by the signatories were false. The notarizations of those signatures were each false and fraudulent, and the assignments to which they were affixed are also fraudulent and legally invalid.

40

144.    Similar procedures were used in the LPS offices in Dakota County, Minnesota, and Jacksonville, Florida, with LPS employees falsely claiming titles as corporate officers, and signing in illegible squiggles, instead of a true signature, in a dishonest attempt at evasion so that many people could sign the same name.

### 3.    Florida

145.    Beginning in approximately January 2010, much of the mortgage assignment operation of LPS moved from Alphretta, Georgia, to Jacksonville, Florida.  In Jacksonville, LPS employees continued their practice to falsely sign mortgage documents as officers of numerous corporations.  For example, in the first quarter of 2010, one LPS employee, Kathy Smith, signed as an officer of several corporations, including: (1) as an officer of Argent Mortgage Company, LLC; (2) as Assistant Secretary of "MERS, Mortgage-Backed Notes, Series 2005-2" (though no such entity exists and derives, apparently, from a mix up of the names of the grantor and grantee, Deutsche Bank National Trust Company as indenture trustee for American Home Mortgage Investment Trust 2005-2, Mortgage-backed Notes, Series 2005-2); (3) as Assistant Secretary of MERS, acting solely as nominee for American Brokers Conduit, (4) as Assistant Secretary of MERS, acting solely as nominee for American Home Mortgage Acceptance, Inc.; (5) as Assistant Secretary of MERS, acting solely as nominee for American Home Mortgage, and (6) as an officer of Sand Cannon Corporation f/k/a Option One Mortgage Corporation.

146.    Likewise, Michelle Halyard signed as an officer of the mortgagee "Argent Mortgage Company, LLC. By Citi Residential Lending, Inc." and as an officer of Mortgage Electronic Registration Systems Inc. as nominee for American Home Mortgage" but she is actually an employee of LPS based in its Florida Offices.

41

147.     The grantees on most of the assignments prepared on July 30, 2009, were MBS trusts that used defendants DEUTSCHE BANK, U.S. BANK or WELLS FARGO as trustee.

148.     The assignments were prepared and filed only in those cases in which foreclosure was likely, due to the default in payments by the borrower-homeowners. When the loans went into default, defendants AHMS, SAXON, WELLS/ASC or AMC/CITI hired defendant LPS, who in turn retained the law firms.  At the direction of their clients, the law firms submitted to the courts the false and forged documents prepared by LPS and its subsidiary, DOCX.

149.     In Florida, for example, five of the largest foreclosure law firms--(1) Florida Default Law Group; (2) Law Offices of Marshall C. Watson, P.A.; (3) Law Offices of David J. Stern, P.A.; (4) Shapiro & Fishman, LLP; and (5) Gladstone Law Group--were each retained by and acted under the direction of LPS.  These law firms regularly submitted to the courts forged mortgage assignments prepared by employees at the LPS offices in Dakota County, Minnesota, Alpharetta, Georgia, or Jacksonville, Florida.

150.     These law firms were paid significant monthly cash incentives for successfully foreclosing on the most properties in the state.  In thousands of foreclosure cases, employees of these law firms falsely signed mortgage assignments pretending to hold the titles of officers of mortgage companies or banks; and other law firm employees notarized these law firm staff assignments falsely attesting that the employees were corporate officers of banks, mortgage servicing companies, or MERS.

151.    Cheryl Samons, the office manager for the Law Offices of David J. Stern, P.A., often signed mortgage assignments as a corporate officer of MERS or other corporations, lacking any authority and without disclosing her affiliation with this law firm.

152.    Erin Cullaro, formerly an attorney employed by Florida Default Law Group, and subsequently an assistant district attorney assigned to the Economic Crimes Unit of the Florida Attorney General's Office in Tampa, Florida, notarized documents in foreclosure cases, often executed apparently by her sister, Lisa Cullaro, another employee of the Florida Default Law Group. These notarizations by Erin Cullaro continued after she changed employers and was hired by the Florida Attorney General's Office. Erin Cullaro's signature is an indecipherable squiggle or mark, or, often, just the letter "E."

153.    Caryn A. Graham, who often signs as a corporate officer of MERS on mortgage assignments prepared by the Law Offices of Marshall Watson, is actually an associate in that law firm. In these cases, LPS paid these law firms to prepare the mortgage assignments that were signed by the law firm employees posing as corporate officers of the grantors.

### 4.    Minnesota

154.    The assignments used by the law firms hired by LPS prepared in the Dakota County, Minnesota, and Jacksonville, Florida, offices followed the same pattern as the DOCX assignments prepared in Alpharetta, Georgia. LPS employees signed as if they were officers of banks and mortgage companies when they were not. The "signatures" were often just a loop, exaggerated check or squiggle, not recognizable as letters of the alphabet and more easily forged by other employees. The notaries often

forgot to complete the notary's attestation and often also signed with loops, checks or squiggles, unrecognizable as alphabet letters.

155.    A LPS employee in Dakota County, Minnesota, Greg Allen, signed mortgage assignments using at least 10 different job titles, as follows:

- Vice President of Mortgage Electronic Registration systems, Inc, solely as nominee for American Brokers Conduit;

- Vice President of Mortgage Electronic Registration systems, Inc, as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President, Mortgage Electronic  Registration Systems, as nominee for Bayrock Mortgage Corporation;

- Vice President, Mortgage Electronic Registration Systems, Inc. as Nominee for First Guaranty Mortgage Corporation;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for Taylor, Bean & Whitaker Mortgage Corp.;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for Market Street Mortgage Corporation;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for Maitland Mortgage Lending Company;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for PMC Lending; and

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for Southstar Funding, LLC.

156.    A LPS employee in Dakota County, Minnesota, Liquenda Allotey, signed mortgage assignments using at least five different job titles, as follows:

- Attorney In Fact for Novastar Mortgage;

- Vice President of Mortgage Electronic Registration systems, Inc, as nominee for American Home Mortgage Acceptance, Inc.;

44

- Vice President of Mortgage Electronic Registration systems, Inc, as nominee for Decision One Mortgage Company, LLC;

- Vice President of Mortgage Electronic Registration systems, Inc, as nominee for Freemont Investment & Loan; and

- Attorney in Fact, JP Morgan Chase Bank, National Association, as Successor-in-Interest to Washington Mutual Bank, as Successor-in-Interest to Long Beach Mortgage Company.

157.    A LPS employee in Dakota County, Minnesota, Alfonzo Greene, signed mortgage assignments using at least three different job titles, as follows:

- Vice President of Mortgage Electronic Registration systems, Inc, solely as nominee for American Brokers Conduit;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for First NLC Financial Services, LLC; and

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Homeowners Friend Mortgage Company, Inc..

158.    A LPS employee in Dakota County, Minnesota, Rick Wilken, signed mortgage assignments using at least five different job titles, as follows:

- Attorney in Fact of JP Morgan Chase Bank, National Association as successor in interest to Washington Mutual Bank as successor in interest to Long Beach Mortgage Company;

- Attorney in Fact of JP Morgan Chase Bank, National Association as successor in interest to Washington Mutual Bank as successor in interest to Long Beach Mortgage Company

- Officer of Washington Mutual Bank as successor in interest to Long Beach Mortgage Company

- Attorney in Fact of Washington Mutual Bank; and

- Vice President of Mortgage Electronic Registration Systems Inc. as nominee for Premier Mortgage Funding, Inc.

159. A LPS employee in Dakota County, Minnesota, Cecilia Knox, signed mortgage assignments using at least two different job titles, as follows:

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for J&S Holdings of Greenville Inc.

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for NovaStar Mortgage Inc.

160. A LPS employee in Dakota County, Minnesota, Bethany Hood, signed mortgage assignments using at least four different job titles, as follows:

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for NovaStar Mortgage Inc.;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Pinnacle Mortgage Inc.;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Lime Financial Services, LTD.; and

- Assistant Vice President of Deutsche Bank National Trust Company, as Trustee for Saxon Asset Securities Trust 2007-1, by Saxon Mortgage Services, Inc..

161. A LPS employee in Dakota County, Minnesota, Topako Love, signed mortgage assignments using at least four different job titles, as follows:

- Assistant Secretary of Option One Mortgage Corp., Attorney in Fact for H&R Block Mortgage;

- Officer of Mortgage Electronic Registration Systems Inc. as nominee for Gateway Funding Diversified Mortgage Services LP;

- Vice-President of Saxon Mortgage Services, Inc., Attorney In Fact for Novastar Mortgage; and

- Vice President, MERS, as nominee for Mortgage Lenders Network USA, Inc..

162. In one instance, a forged "Assignment of Mortgage" signed by Topako Love, the date of assignment, February 9, 2009, is after the foreclosure is completed. The

assignment to DBNTC is signed by Topako Love on behalf of Saxon Mortgage Services, Inc., as attorney in fact for Novastar Mortgage. The assignment was prepared by Karen A. Thompson, Esq., of the Law Office of Marshall C. Watson. A typewritten note on the right hand side of the document states: "This Assignment of Mortgage was inadvertently not recorded prior to the Final Judgment of Foreclosure in Case #56-2008-CA-002423, but is now being recorded to clear title." The docket for the St. Lucie County Clerk of the Court shows the case number corresponds to *DEUTSCHE BANK v. CHRISTY WATTS*, filed March 19, 2008. On January 23, 2009, a final judgment of foreclosure was entered by default in this case. On January 28, 2009, the plaintiff made a motion for substitution of party plaintiff, to "Deutsche Bank National Trust Co. as trustee from Novastar," which the court approved on the same day, the docket shows. On February 9, 2009, eleven days later, the purported assignment of mortgage from Novastar to DBNTC was signed, and recorded on February 24, 2009. According to the calendar in the docket, during this foreclosure, DBNTC did not hold title to the mortgage, contrary to its representations to the court. The Assignment of Mortgage, filed well after the judgment of foreclosure was entered, was forged.

163. A LPS employee in Dakota County, Minnesota, Christina Allen, signed mortgage assignments using at least three different job titles, as follows:

- Attorney In fact, JP Morgan Chase Bank Attorney In fact for Deutsche Bank

- National Trust Company, as Trustee Beach Mortgage Loan Trust (sic);

- Vice President, MERS, as nominee for First National Bank of Arizona; and

- Vice President, MERS, as nominee for Mortgage Lenders Network USA, Inc..

164.     A LPS employee in Dakota County, Minnesota, Eric Tate, signed mortgage assignments using at least six different job titles, as follows:

- Attorney In fact, JP Morgan Chase Bank Attorney In fact for Deutsche Bank;

- National Trust Company, as Trustee Beach Mortgage Loan Trust (sic);

- Attorney In fact, JP Morgan Chase Bank as successor in interest to Washington Mutual Bank formerly known as Washington Mutual Bank;

- Vice President of Mortgage Electronic Registration systems, Inc, solely as nominee for American Brokers Conduit;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for First NLC Financial Services, LLC;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Homeowners Friend Mortgage Company, Inc.; and

- Assistant Vice President of The Coastal Bank.

165.     As mentioned above, for the LPS employees in Dakota County, Minnesota (Greg Allen, Liquenda Allotey, Alfonzo Greene, Rick Wilken, Cecilia Knox, Bethany Hood, Topako Love, Christina Allen, and Eric Tate), the use of so many corporate titles shows it is unlikely that the LPS employees were actually the officers of any of the named companies; the LPS employees lacked corporate authority to sign the documents on behalf of the companies.

166.     In most cases, the assignments prepared by LPS employees in Dakota County, Minnesota, and Jacksonville, Florida, benefited the same banks and trusts that benefited from the assignments prepared in Alpharetta, Georgia, namely the Trustee Bank Defendants.

167.    The assignments often were made by grantors who had not themselves been validly assigned the mortgage by the original lender, or by subsequent grantees of the original lender, and so had no title to transfer.  The LPS employees most often represented, falsely, that MERS, or a mortgage servicing company, particularly AHMS or SAXON, had authority to assign the mortgage to the trust when an assignment from the original lender had never been validly made.

168.    The assignments described above were prepared with disregard to the veracity of the stated information.  In addition to the forgeries discussed above, concerning the signers' identities and the authority of the signers, further irregularities were found, namely: (1) the dates on which the properties became part of the trust were incorrectly stated; (2) the signers often signed as officers of mortgage companies that had filed for bankruptcy or no longer existed, and the signatures were affixed without authorization of the trustee for the estates in the bankruptcy courts or by an authorized party of a purchaser of the companies; and (3) the grantor or grantee was often incorrectly stated, with the grantor or grantee identified in at least 10 instances as "Bogus Assignee for Intervening ASMTS," and in several other cases identified as "A Bad Bene."  In other cases, the mortgage company officer forgot to sign, but the empty line was nonetheless witnessed and notarized.  In yet other cases, the original loan amount was misstated as $.00 or $.01.

169.    In countless other mortgage foreclosure cases, LPS employees prepared affidavits which were filed with courts by the foreclosing law firms in support of summary judgment motions.  In these affidavits, the employees again misrepresented their job titles and their personal knowledge of the facts set forth in the affidavits.

49

170.     For example, in a "Lost Assignment Affidavit," dated September 16, 2009, and signed by Green as vice president of American Home Mortgage Servicing, Inc., she asserts that a note dated June 8, 2007, by Michael McGargle, to the order of Homebanc Mortgage Corporation, is lost and not obtainable.  Obviously, Green, who works for DOCX, has no knowledge whatsoever of the location or transfer of the documents involved from Homebanc Mortgage Corporation to American Home Mortgage Servicing, Inc..

171.     In December 2009, the Fulton County, Georgia, District Attorney's office conducted an investigation of complaints received regarding the documents produced by the Alpharetta, Georgia, office of DOCX.  While claiming to cooperate with the investigation, LPS made misleading statements and concealed the extent of the problems with the fraudulent documents it produced to facilitate mortgage foreclosures, while continuing many of the same practices in Jacksonville, Florida.

172.     Thousands of additional fraudulent assignments were prepared and filed in December 2009, and January and February 2010.  Most of these "Remediation Assignments" bore the abbreviation "DXFX1 or DXFX2" in the client identification square, but no disclosures were made to investors, courts or mortgagees of the existence and scope of the fraudulent documents.  In hundreds of other cases, after the "remediation," assignments were prepared, signed and notarized in the LPS offices in Dakota County, Minnesota, and Jacksonville, Florida, no information identifying the involvement of LPS was included and, instead, a notation was included on these assignments that they were prepared by the "Law Offices of David Stern," or other law firms hired by LPS.

**B.    Mortgage Assignments Signed By Officers Of The Grantee Fraudulently Identifying Themselves As Officers Of The Grantor**

173.    Relator's investigations revealed that hundreds of mortgage assignments were signed by officers of defendant BA, who fraudulently signed on behalf of the grantor, when they were actually employees of the grantee.  By signing as officers of the grantor BA officers, lacking any authority, fraudulently created mortgage assignments to be filed in foreclosure actions.

174.    Among the fraudulent assignments used by defendant BA are also fraudulent documents prepared and signed by employees of the mortgage servicing company Defendant LPS. LPS employees Greg Allen, Liquenda Allotey, Christine Anderson, John Codi, John Sobotta, Eric Tate and Rick Wilken signed thousands of documents each week with no review nor any knowledge of their contents, creating forged assignments using fraudulent titles in order to proceed with foreclosures.

175.    Liquenda Allotey, for example, used several titles in documents signed and used in foreclosures by defendant BA in a three-months period:

- Vice President, MERS as Nominee for Bear Sterns Residential Mortgage Corporation;

- Vice President, MERS as Nominee for Ppeples (sic) Choice Home Loan Inc.;

- Vice President MERS as Nominee for First Bank d/b/a First Bank Mortgage;

- Vice President, MERS, as Nominee for EMC Mortgage Corporation;

- Vice President, MERS as Nominee for Mortgage Works Unlimited Inc., d/b/a The Mortgage Works;

- Vice President, MERS as Nominee for Encore Credit Corp. d/b/a ECC Credit Corporation;

- Vice President, MERS.

176. Liquenda Allotey also signed documents used in foreclosures by the

Trustee Bank Defendants using these additional titles:

- Attorney-in-fact, JPMorgan Chase Bank N.A. as successor in interest to Washington Mutual Bank;

- Vice President, MERS as Nominee for Allied Home Mortgage Capital Corp.;

- Vice President, MERS as Nominee for American Home Mortgage Acceptance;

- Vice President, MERS as Nominee for Ampro Mortgage, a division of United Financial Mortgage Corp.;

- Vice President, MERS as Nominee for Colorado Federal Savings Bank;

- Vice President, MERS as Nominee for CTX Mortgage Company, LLC;

- Vice President, MERS, as Nominee for Decision One Mortgage Company, LLC;

- Vice President, MERS as Nominee for Entrust Mortgage Inc.;

- Vice President, MERS, as Nominee for EquiFirst Corp;

- Vice President, MERS as Nominee for Fairfield Financial Mortgage Corp. Inc.;

- Vice President, MERS as Nominee for First Guaranty Mortgage Corp;

- Vice President, MERS as Nominee for First Horizon Home Loan Corp.;

- Vice President, MERS, First NLC Financial Services LLC;

- Vice President MERS as Nominee for First Residential Mortgage Services Corp.;

- Vice President MERS as Nominee for Fremont Investment & Loan;

- Vice President MERS as Nominee for GreenPoint Mortgage Funding Inc.;

- Vice President MERS as Nominee for Homequest Capital Funding;

- Vice President MERS as Nominee for Ivanhoe Financial Inc.;

- Vice President MERS, MERS as Nominee for Lending First Mortgage;

- Vice President MERS as Nominee for Market Street Corp.;

- Vice President, MERS, as Nominee for Meritage Mortgage Corp.;

- Vice President, MERS as Nominee for Metrocities Mortgage LLC;

- Vice President, MERS as Nominee for Mortgage Network, Inc.;

- Vice President MERS as Nominee for Pinnacle Mortgage Inc.;

- Vice President MERS as Nominee for SouthStar Funding LLC.

177.    In some instances, employees of the law firms hired by defendant BA signed as MERS officers, lacking any authority and without disclosing their affiliation with those law firms.

178.    Rhonda Weston, a Vice President of defendant BA signed assignments as an officer of other entities to assign mortgages to BA.  The titles used by Rhonda Weston were: (i) Assistant Secretary, MERS for American Brokers Conduit, (ii) Authorized Officer, MERS, as Nominee for CTX Mortgage Company, and (iii) Authorized Officer, Wells Fargo as Trustee, Banc of America Alternative Loan Trust 2006-8. All of these assignments are fraudulent.

179.    In other cases, Relator found that the Trustee Bank Defendants used fraudulent mortgage assignments prepared by the Mortgage Foreclosure Servicing Defendants in Fort Mill, South Carolina to supply missing assignments.  John Kennerty and other officers signed on behalf of the grantor without any authority.

53

180.    Furthermore, Relator found that numerous assignments used by the Trustee Bank Defendants were fabricated within 30 days of the commencement of the foreclosure actions.  Because the mortgage assignments were missing, the Defendants created forged assignments to proceed with foreclosures when needed. Defendant BA created several forged assignments within a few days of the commencement of the foreclosure.  For example, an assignment from Defendant, WELLS FARGO to defendant BA, as Trustee for Lehman XS Trust Series 2007-9 was filed on the same date of the filing of the foreclosure action for which it was fabricated. Likewise, an assignment from WASHINGTON MUTUAL BANK N.A. to BA as Trustee for WaMu Series 2007-0A4 Trust, was filed on March 30, 2009 while the foreclosure action was filed on February 27, 2009, over a month before defendant BA acquired the mortgage. An assignment from JPMorgan Chase to BA, as Trustee for WaMu Series 2006-AR9 Trust, was signed on March 3, 2009, while the foreclosure action was filed prior to that date on February 27, 2009.  Another assignment from WELLS FARGO to Defendant BA was signed and notarized on December 29, 2008 but the transfer is said to have taken place over three years prior to that date "on or before November 23, 2005."  Relator detected numerous cases of similar fraudulent assignments filed in foreclosure actions pursued by the Defendants.

181.    Despite the lack of valid assignments, the Trustee Bank Defendants offered securities to the investors knowing that the MBS Trusts did not have good title to the collateral assets.

54

**C.**   **Defendants' Use of Fake Documents, False Officer Titles, and Forged Signatures Violates the Federal Lending Laws, and State Mortgage Fraud and Notary Fraud Laws**

182.    As with Relator's Foreclosure, the assignments are forged and void in each and every one of the foreclosures relying on documents derived from the Defendants.

183.    Affixing or submitting false signatures on a mortgage document is a violation of federal and state law, and those signatures are without authority to complete the transaction.  *See, e.g.,* federal laws cited in paragraph 47, above; *and see*, Georgia Residential Mortgage Fraud Act, Ga. Code § 16-8-100 *et seq.* (crime considered a felony); Minn. Stat. § 609.64, recording, filing of forged instrument ("Whoever intentionally presents for filing, registering, or recording, or files, registers, or records a false or forged instrument relating to or affecting real or personal property in a public office entitled to file, register, or record such instrument when genuine may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $5,000, or both.").  South Carolina law also prohibits and punishes mortgage fraud.  S.C. Code § 16-13-10(A) (1), Forgery ("It is unlawful for a person to:  falsely make, forge, or counterfeit; cause or procure to be falsely made, forged, or counterfeited; or wilfully act or assist in the false making, forging, or counterfeiting of any writing or instrument of writing.")(penalty is a felony); *and*, S.C. Code § 37-22-190(A)(8), Consumer Protection Code, Mortgage Lending, Prohibited activities; violation of state or federal law ("In addition to the activities prohibited by other provisions of state or federal law, it is unlawful for a person licensed pursuant to this chapter, in the course of a mortgage loan origination, to: engage in a transaction, practice, or course of business in connection with the making or servicing of, or purchase or sale of, a mortgage loan that is not in good

faith or fair dealing, that is unconscionable, as set forth in Section 37-5-108, or that constitutes a fraud upon a person.").

184.  False or fraudulent notary acknowledgements are also a violation of state law, and the underlying signature is void.  *See, e.g.,* Georgia notary fraud, O.C.G. § 45-17-1 *et seq.* (penalty is a misdemeanor); Minn. Stat. § 359.085, standards of conduct for notarial acts ("In witnessing or attesting a signature, the notarial officer must determine, either from personal knowledge or from satisfactory evidence, that the signature is that of the person appearing before the officer and named in the document  or electronic record. When witnessing or attesting a signature, the officer must be present when the signature is made."); *and* S.C. Code § 26-1-95 ("A notary public who, in his official capacity, falsely certifies to affirming, swearing, or acknowledging of a person or his signature to an instrument, affidavit, or writing is guilty of a misdemeanor and, upon conviction, must be fined not more than two hundred dollars or imprisoned not more than thirty days.")

185.  The mortgage assignments prepared by defendant LPS employees or agents, or the employees of law firms retained by LPS, are likely fraudulent, in violation of law, and do not assign the notes and mortgages to the Trustee Bank Defendants. Therefore, the Trustee Bank Defendants lack any authority to act as plaintiffs in foreclosure actions filed on defaulted notes and mortgages for their MBS, the Trustee Bank Defendants are not a true party in interest in such foreclosures, and cannot prosecute the foreclosures.

### D.  Defendants' False Statements To The Investors

186.  All of the MBS Trusts that used false or fraudulent mortgage assignments, and were never assigned the notes and the mortgages, issued false statements to the investors, including the U.S. Government, the States of California, Delaware, Florida,

Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York.

187.    False statements and material omissions concerning the notes and mortgage assignments were included in each prospectus for the trusts.  Illustrative are the false statements and material omissions included in the filings of Soundview Home Loan Trust 2006-OPT2 ("Soundview Trust 2006"), one of the MBS Trust including false assignments and including Relator's Mortgage.  The prospectus of Soundview Trust 2006 filed on March 29, 2006 represents to the investors that:

> On the Closing Date,[4] the Depositor[5] will transfer to the Trust all of its right, title and interest in and to each Mortgage Loan[6], the related mortgage note, Mortgage, assignment of mortgage in recordable form in blank or to the Trustee[7] and other related documents received from the Originator[8] pursuant to the Master Agreement (collectively, the *"Related Documents"*), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date.[9] The Trustee, concurrently with such transfer, will deliver the Certificates to the Depositor.

---

[4] The Closing Date is "on or about April 7, 2006."

[5] The Depositor is Financial Asset Securities Corporation, a Delaware corporation and affiliate of Greenwich Capital Markets, Inc..

[6] Mortgage Loan is defined as: "On the Closing Date the trust will acquire a pool of approximately 7,459 first lien and second lien, fixed-rate and adjustable-rate mortgage loans having an aggregate principal balance as of the Cut-Off Date of approximately $1,500,000,000 (the "Initial Mortgage Loans"), additional first and second lien, fixed-rate and adjustable-rate mortgage loans that will be included in the mortgage pool on the Closing Date (the "Additional Mortgage Loans") and together with the Initial Mortgage Loans, the "Mortgage Loans").

[7] The Trustee is Defendant Deutsche Bank National Trust Company.

[8] The Originator is Option One Mortgage Corporation.

[9] The Cut-off Date is April 1, 2006.

As detailed above, these statements are false and misleading in that the loans were never acquired.

188.    The prospectus in the section entitled "Assignment of the Mortgage Loans" further states that :

> "On the Closing Date, **the Depositor will transfer to the Trust all of its right, title and interest in and to each Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage in recordable form in blank or to the Trustee and other related documents received from the Originator pursuant to the Master Agreement** (collectively, the "Related Documents"), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date. The Trustee, concurrently with such transfer will deliver the Certificates to the Depositor.[…]"
>
> **The Pooling Agreement will require that, within the time period specified therein, the Depositor will deliver or cause to be delivered to the Trustee (or a custodian on behalf of the Trustee) the mortgage notes endorsed to the Trustee on behalf Certificateholders and the Related Documents.** In lieu of delivery of original Mortgages or mortgage notes, if such original is not available or is lost, the Depositor may deliver or cause to be delivered true and correct copies thereof, or, with respect to a lost mortgage note, a lost note affidavit executed by the Originator. […] On or prior to the Closing Date, the Trustee (or the Custodian on behalf of the Trustee) will review the Mortgage Loans and the Related Documents pursuant to the Pooling Agreement and if any Mortgage Loans or Related Documents is found not to conform to the Custodian's review criteria set forth in the Pooling Agreement and if any material defect is not cured within 90 days following notification thereof to the Originator by the Trustee, the Trustee will enforce the Originator's obligations under the Mortgage Loan Purchase Agreement to either: (i) substitute for such Mortgage Loan a qualified substitute mortgage loan; however, such substitution is permitted only within two years of the Closing Date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs (as defined in the Pooling Agreement) as a REMIC or result in a prohibited transaction tax under the

58

> Code; or (ii) purchase such Mortgage Loan at a price (the
> "*Purchase Price*") equal to the outstanding Principal
> Balance of such Mortgage Loan as of the date of purchase,
> plus all accrued and unpaid interest thereon, computed at
> the Mortgage Rate through the end of the calendar month in
> which the purchase is effected, plus the amount of any
> unreimbursed Advances and Servicing Advances (each as
> defined herein) made by the Servicer, and any unpaid
> servicing fees plus costs and damages incurred by the Trust
> in connection with any violation by such loan of any
> predatory-or abusive-lending law. […]

(Emphasis added)

189.    The prospectus further states that Wells Fargo Bank N.A. is the custodian

for the Trustee with respect to certain mortgage loans under the pooling agreement

pursuant to a custodial agreement and that:

> "the Custodian will hold the mortgage notes, mortgages
> and other legal documents in the mortgage files for the
> benefit of the certificateholders. The Custodian will
> maintain the mortgage file in secure and fire resistant
> facilities.  The mortgage files will not be segregated from
> other mortgage files in the Custodian's custody but will be
> kept in shared facilities.  However, the Custodian's
> proprietary document tracking system will show the
> location within the Custodian's facilities of each mortgage
> file and will show that the mortgage loan documents are
> held by the Custodian on behalf of the Trust.   The
> Custodian will review each mortgage file in accordance
> with the review criteria specified in the Pooling Agreement
> and deliver a certification to the effect that, except as noted
> in the certification, all required documents have been
> executed and received."

These statements are false in that the mortgage notes were never delivered and are not

included among the files maintained by Wells Fargo.

190.    The Pooling and Servicing Agreement, filed with the SEC on April 4,

2006, contains additional false statements and material omissions.  Section 2.01 of the

Pooling and Servicing Agreement, entitled "Conveyance of Mortgage Loans," states that,

among others, the following documents were delivered to the trust: (i) the original mortgage note, (ii) the original mortgage, (iii) an original assignment, and (iv) an original of any intervening assignment of mortgage showing a complete chain of assignment. These documents were never transferred and these statements are false and fraudulent.

191. Furthermore, the prospectus required the Trustee to certify "that as to each Mortgage Loan listed in the Mortgage Loan Schedule […] it (or its custodian) has received the applicable documents listed in Section 2.01 of the Pooling and Servicing Agreement." Because the documents were never delivered, this certification by the Trustee was false. Analogous certification is issued by the custodian attesting that it has received a custodian file with respect to each mortgage loan including the documents identified in section 2.01 of the Pooling and Servicing Agreement, among others.

192. These statements disseminated to the investors, which are substantially the same in all of the prospectuses, pooling and servicing agreements and trustee certifications for the trusts here at issue, are false because the MBS Trusts never acquired most of the mortgage loans. The Trustees never reviewed the assignments, the notes, or any relevant documents or, if they did, they knowingly disregarded the missing assignments. Furthermore, rather than following the prospectus' specific procedures to correct the issue, the Defendants created fraudulent assignments to conceal it. Indeed, the act of fabricating the assignments is evidence that the MBS Trust did not own the notes and/or the mortgage liens for some assets claimed to be in the pool.

193. SEC regulations required the depositors and the Mortgage Foreclosure Servicing Defendants of the MBS Trusts to file certificates attesting that they have

fulfilled their duties.  In particular, 17 C.F.R. § 229.1122(d)(4) require mortgage servicers to file a report indicating whether "[c]ollateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents" and whether "[p]ool assets and related documents are safeguarded as required by the transaction agreements."  Similarly, 17 C.F.R. § 229.1123 requires filing a statement that "the servicer has fulfilled all of its obligations under the agreement in all material respects throughout the reporting period or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof."

194.  The certificates filed by the Mortgage Foreclosure Servicing Defendants pursuant to these provisions were false, because they failed to state that the notes and mortgage assignments had not been transferred to the trusts.  In some instances, the Defendants noted non-compliance, but only with reference to minor issues and never disclosed that the mortgage and the notes and the related documents were missing.  For example, in the certification filed by Defendant SAXON accompanying the form 10-K for the MBS Trust Merrill Lynch First Franklin Mortgage Loan Trust/Series 2007-1 filed on March 15, 2007, David Dill signed SAXON's certification disclosing that "in regard to Items 1122(d)(4) and 1122(d)(1)(ii),[10] based on a review of a sample of 45 loans, it was determined that 36 lien releases where not sent to consumers or to the recording jurisdiction, as appropriate."  Defendant SAXON failed to inform the investors that, in violation of the SEC regulation 17 C.F.R. § 229.1122 the collateral was not maintained as required by the applicable agreements and that the relevant documentation was missing.

---

[10] This item requires policies and procedures to be instituted if material servicing activities are outsourced.

195.    The depositors also issued false certificates of compliance attached to forms 10-K, filed with the SEC and disseminated to the investors.  In these certificates the depositor falsely alleged that the periodic reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements not misleading.  The certificates also contained a declaration of compliance with 17 C.F.R. § 229.1123.  The provision requires an assessment of whether the mortgage and related documents, rather than the physical properties underlying the mortgages, are maintained as required by the transaction agreements or related pool asset documents.  The depositors did not comply with the requirement imposed by the regulation because the mortgage and related documents were not maintained as required.

196.    The MBS Trusts also filed monthly reports including details on the foreclosures, among other information.  The reports omit to state that notes and mortgage assignments were missing and fail to disclose the fraudulent activities conducted by the Defendants to pursue foreclosures.

197.    Defendants knowingly issued these false statements and omissions to the investors.  The Defendants knew, or should have known, that among the investors were the U.S. government and the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York.  The U.S. Government, the States, the City of Chicago and the City of New York, had routinely purchased MBS securities and their future purchases of securities of the MBS Trusts including false or fraudulent representations and omission was foreseeable.

## VII. THE U.S. GOVERNMENT PURCHASED MORTGAGE-BACKED SECURITIES MADE UP OF MORTGAGES WITH MISSING OR FORGED ASSIGNMENTS FROM ORIGINATING BANKS TO THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL FINANCIAL HARM

198.     The U.S. government has purchased MBS with missing or forged assignments through several avenues.  These include: (1) Federal Reserve funding to purchase MBS through two limited liability companies, titled "Maiden Lane;" (2) Treasury and other agency funding to purchase MBS through public-private partnership investment funds; and (3) Federal Reserve direct purchases of MBS.

### A.     Types of MBS

199.     There are two types of mortgage-backed securities: (1) residential MBS ("RMBS") is composed of home mortgages, such as Relator's Mortgage and ones described herein; and (2) commercial MBS ("CMBS") is composed of mortgages for retail space, office buildings and warehouses, which is not at issue in this suit.  The present case is concerned with RMBS.

200.     RMBS is categorized as "agency" or "non-agency," which refers to involvement of the government-sponsored entities, *e.g.*, Freddie Mac, Fannie Mae and Ginnie Mae.  Non-agency RMBS are residential mortgage-backed securities that are not issued or guaranteed by a U.S. government agency.  Like agency RMBS, non-agency RMBS represent interests in "pools" of mortgage loans secured by residential real property.

### B.     MBS Purchases by Federal Reserve Funding of Maiden Lane Transactions

201.     In 2008, to respond to the financial crisis, the Federal Reserve Board authorized the Federal Reserve Bank of New York ("New York Fed") to facilitate the formation of three limited liability companies.  Two of these companies hold MBS which

are missing assignments or using forged assignments.  (The third company formed does not hold MBS).

202.    The first of these companies, Maiden Lane LLC ("ML LLC"), was formed to facilitate the merger of the Bear Stearns Companies, Inc., and JPMorgan Chase & Co., Inc..  The New York Fed extended credit to ML LLC to acquire certain assets of Bear Stearns.

203.    The U.S. government provided the funds to ML LLC to purchase the MBS; according to statement of the New York Fed: "ML LLC was formed in the second quarter of 2008.  ML LLC borrowed approximately $28.8 billion from the New York Fed in the form of a senior loan (Senior Loan), which, together with funding from JPMC of approximately $1.15 billion in the form of a subordinate loan (Subordinate Loan, and together with the Senior Loan, the Loans) was used to purchase the Asset Portfolio from Bear Stearns.  The Asset Portfolio had an estimated fair value as of March 14, 2008, of approximately $30 billion.  The New York Fed has all material control rights over the Asset Portfolio and is the sole and managing member of ML LLC."  New York Fed Web site (http://www.newyorkfed.org/markets/ maidenlane.html).

204.    As of March 31, 2010, ML LLC had purchased and held $2.069 billion in 12 MBS that Relator found has missing or forged assignments.  According to the published list of ML LLC holdings, the 12 MBS listed in Table 2, below, correspond to the MBS which Relator found to have missing or forged assignments.

Table 2.  Maiden Lane LLC Holdings, as of March 31, 2010, that are included among
the forged assignments listed in Exhibit 3

| # | Maiden Lane LLC Holding | Government Funding |
|---|---|---|
| 1 | Bear Stearns ALT-A II, 2007-1 [a/k/a CITIBANK: Structured Asset Mort. | $1,148,679,970 (at 67) |

| | Investments II, Inc., Bear Stearns ALT-A Trust II, Series 2007-1] | |
|---|---|---|
| 2 | Harborview MTG LN TR 2006-9 [a/k/a DEUTSCHE BANK: HarborView Mort. Loan Trust, Series 2006-9] | $17,289,000 (at 75) |
| 3 | Morgan Stanley ABS 2007-HE2 [a/k/a DEUTSCHE BANK: Morgan Stanley ABS Capital 1, Inc., MSAC 2007-HE2] | $738,000 (at 77) |
| 4 | SOUNDVIEW HM LN 2007-OPT2 [a/k/a WELLS FARGO: Soundview Home Loan Trust 2007-OPT2] | $6,650,000 (at 81) |
| 5 | STRUCTURED ASSET MTG 2007-AR2 [a/k/a CITIBANK: Structured Asset Mort. Investments II Trust 2007-AR2] | $58,506,154 (at 83) |
| 6 | STRUCTURED ASSET MTG 2007-AR5 [a/k/a CITIBANK: Structured Asset Mort. Investments II Trust 2007-AR5] | $8,735,000 (at 83) |
| 7 | STRUCTURED ASSET MTG 2007-AR6 [a/k/a CITIBANK: Structured Asset Mort. Investments II Trust 2007-AR6] | $819,668,268 (at 83) |
| 8 | AMSI 2005-R3 M8, M9 [a/k/a DEUTSCHE BANK: Ameriquest Mort. Securities Trust 2005-R3] | $800,000 (at 101) |
| 9 | AMSI 2005-R7 M8 [a/k/a DEUTSCHE BANK: Ameriquest Mort. Securities Trust 2005-R7] | $10,000,000 (at 101) |
| 10 | CARR 2006-OPT1 M9 [a/k/a WELLS FARGO: Carrington Mort. Loan Trust, Series 2006-OPT1] | $2,000,000 (at 107) |
| 11 | MSAC 2005-HE1 B3 [a/k/a DEUTSCHE BANK: Morgan Stanley ABS Capital 1, Inc., Series 2005 HE1] | $2,093,798 (at 119) |
| # | *Maiden Lane LLC Holding* | *Government Funding* |
| 12 | SVHE 2006-EQ1 M5 [a/k/a DEUTSCHE BANK: Soundview Home Loan Trust, Series 2006-EQ1] | $-5,660,323 (at 126) |

*Source*: Federal Reserve Bank of New York Web site, Maiden Lane Transactions, "Holdings of Maiden Lane LLC as of March 31, 2010" (http://www.newyorkfed.org/markets/maidenlane.html).

205.    The second and third companies, Maiden Lane II LLC ("ML II LLC") and

Maiden Lane III LLC ("ML III LLC"), were formed to facilitate the restructuring of the

New York Fed's financial support to American International Group ("AIG").  The New

York Fed extended credit to ML II LLC to purchase residential mortgage-backed securities from the securities lending portfolio of several regulated U.S. insurance subsidiaries of AIG. ML III LLC represented that it purchased only collateralized debt obligations, and did not purchase MBS, as shown on its list of holdings as of March 31, 2010.

206. According to the New York Fed, the U.S. government provided the funds to ML II LLC to purchase the MBS: "ML II LLC was formed in the fourth quarter of 2008. On December 12, 2008, ML II LLC purchased RMBS with an estimated fair value of approximately $20.8 billion, determined as of October 31, 2008, (Asset Portfolio). ML II LLC financed this purchase by borrowing $19.5 billion (Senior Loan) from the New York Fed. The Senior Loan proceeds, after adjustments (totaling $0.3 billion between October 31, 2008, and December 31, 2008) including principal and interest payments received by the AIG Subsidiaries on the RMBS, were used to purchase the $20.8 billion Asset Portfolio. In addition to receiving the cash purchase price on the closing date, AIG Subsidiaries received a contingent right to collect the deferred portion of the total purchase price of $1.0 billion (Fixed Deferred Purchase Price) plus a one-sixth participation in the residual portfolio cash flow, if any, each following ML II LLC's repayment of the Senior Loan and accrued interest thereon to the New York Fed. As of October 31, 2008, the Asset Portfolio had a par value of approximately $39.3 billion. The New York Fed has all material control rights over the Asset Portfolio and is the sole and managing member of ML II LLC." New York Fed Web site, Maiden Lane II LLC transactions (http://www.newyorkfed.org/ markets/maidenlane2.html ).

207.    As of March 31, 2010, ML II LLC had purchased and held $570 billion in

15 MBS that Relator found has missing or forged assignments.  According to the

published list of ML LLC holdings, the 12 MBS listed in Table 3, below, correspond to

the MBS which Relator found to have missing or forged assignments.

Table 3. Maiden Lane II LLC Holdings, as of March 31, 2010, that are included among
the forged assignments listed in Exhibit 3

| # | Maiden Lane II LLC Holding | Government Funding |
|---|---|---|
| 1 | ACE_06-OP1<br>[a/k/a HSBC: Ace Securities Corp. Home Equity Loan Trust, Series 2006-OP1] | $7,000,000 (at 1) |
| 2 | AMIT_05-3<br>[a/k/a DEUTSCHE BANK: American Home Mort. Investment Trust Series 2005-3] | $35,658,000 (at 1) |
| 3 | ARMT_07-1<br>[a/k/a U.S. BANK: MASTR Adjustable Rate Mortgages Trust 2007-1] | $11,156,000 (at 1) |
| 4 | ABFC_06-OPT2<br>[a/k/a WELLS FARGO: ABFC 2006-OPT 2 Trust] | $12,000,000 (at 1) |
| 5 | BSAA_07-3<br>[a/k/a CITIBANK: Structured Asset Mort. Investments II, Inc., Bear Stearns ALT-A Trust, Series 2007-3] | $156,304,497 (at 2) |
| 6 | CARR_06-OPT1<br>[a/k/a WELLS FARGO: Carrington Mort. Loan Trust, Series 2006-OPT1] | $28,786,919 (at 3) |
| # | Maiden Lane II LLC Holding | Government Funding |
| 7 | BNCMT_07-3<br>[a/k/a CITIBANK: BNC Mortgage Loan Trust 2007-3] | $30,000,000 (at 2) |
| 8 | MSAC_07-HE6<br>[a/k/a DEUTSCHE BANK: Morgan Stanley ABS Capital 1, Inc., Series 2007-HE6] | $68,000,000 (at 10) |
| 9 | MSIX_06-1<br>[a/k/a DEUTSCHE BANK: Morgan Stanley IXIS Real Estate Capital Trust, 2006-1] | $43,255,000 (at 10) |

| 10 | OOMLT_05-4<br>[a/k/a WELLS FARGO: Option One Mort. Loan Trust, Series 2005-4] | $15,151,774 (at 12) |
| 11 | OOMLT_05-5<br>[a/k/a WELLS FARGO: Option One Mort. Loan Trust, Series 2005-5] | $5,866,603 (at 12) |
| 12 | OOMLT_06-3<br>[a/k/a WELLS FARGO: Option One Mort. Loan Trust, Series 2006-3] | $23,500,000 (at 12) |
| 13 | SAST_06-3<br>[a/k/a DEUTSCHE BANK: Saxon Asset Securities Trust 2006-3] | $111,000,000 (at 14) |
| 14 | SAIL_04-8<br>[a/k/a LASALLE BANK: Securitized Asset Investment Loan Trust, 2004-8] | $10,256,786 (at 14) |
| 15 | WAMU_07_HE3<br>[a/k/a CITIBANK: WAMU Series 2007-HE3 Trust] | $12,000,000 (at 15) |

*Source*: Federal Reserve Bank of New York Web site, Maiden Lane Transactions, "Holdings of Maiden Lane II LLC as of March 31, 2010" (http://www.newyorkfed.org/markets/maidenlane.html ).

208.    In total, the ML LLC and ML II LLC entities own $2.639 billion ($2.069 billion ML LLC + $570 million ML II LLC) of MBS including missing assignments or use forged assignments, as shown in Tables 2 and 3 above.

## C.    MBS Purchases by Treasury Financing of Public-Private Partnership Funds.

209.    In addition to the purchases above, to purchase non-agency RMBS, and other securities, on March 23, 2009, the U.S. Treasury, in conjunction with the Federal Deposit Insurance Corporation and the Federal Reserve Bank, announced the creation of the Public-Private Investment Partnership ("PPIP") of 2009, as a part of the government's Financial Stability Plan. Under the PPIP, the Treasury provides equity and debt financing to newly-formed public-private investment funds ("PPIFs") established by fund managers with investors for the purpose of purchasing legacy securities from financial

institutions.  These securities are commercial MBS and non-agency residential MBS.

According to a Treasury press release: "The PPIP is designed to encourage the transfer of

certain illiquid legacy real estate-related assets off of the balance sheets of financial

institutions, restarting the market for these assets and supporting the flow of credit and

other capital into the broader economy.  PPIP funds established under the legacy loan

program will be established to purchase troubled loans from insured depository

institutions and PPIP funds established under the legacy securities program to purchase

from financial institutions legacy non-Agency RMBS and newly issued and legacy

CMBS that were originally AAA rated. PPIFs will have access to equity capital from the

U.S. Treasury as well as debt financing provided or guaranteed by the U.S. government."

      210.    In 2009, the Treasury selected private fund managers to operate funds that

would purchase non-agency RMBS through a mix of private and government financing,

listed in Table 4, below ("PPIF Managers").

Table 4.  PPIFs holding non-agency RMBS, as of 3/31/10

| # Fund | Fund Creation Date |
|---|---|
| 1. AG GECC PPIF Master Fund, L.P. | 11/12/09 |
| 2. AllianceBernstein Legacy Securities Master Fund, L.P. | 10/23/09 |
| 3. Blackrock PPIF, L.P. | 10/16/09 |
| 4. Invesco Legacy Securities Master Fund, L.P. | 10/13/09 |
| 5. Marathon Legacy Securities Public-Private Investment Partnership, L.P. | 12/15/09 |
| 6. Oaktree PPIP Fund, L.P. | 02/19/10 |
| 7. RLJ Western Asset Public/Private Master Fund, L.P. | 11/23/09 |
| 8. Wellington Management Legacy Securities PPIF Master Fund, LP | 10/19/09 |

*Source*: U.S. Treasury, Legacy PPIP Second Quarterly Report (quarter ending March 31, 2010) (http://www.financialstability.gov/roadtostability/publicprivatefund.html).

211.    In 2009, the Treasury entered into limited partnership agreements ("PPIP Agreements") with each of the PPIF Managers listed in Table 4 to purchase a portfolio of non-agency RMBS.  *See* U.S. Treasury, Legacy Securities Public-Private Investment Program, Fund Manager Documentation, Limited Partnership and Loan Agreements (http://www.financialstability.gov/roadtostability/legacysecurities.html#contracts).

212.    Under the terms of the PPIP Agreements, the Treasury provided debt and equity financing to the PPIF Managers from the Troubled Asset Relief Fund ("TARP"), created by the Emergency Economic Stabilization Act of 2008 ("EESA"), Pub. L. No. 110-343, 122 Stat. 3765 (2008), *codified at* 12 U.S.C. § 5201 *et seq*..  Congress passed the EESA, which provided the Treasury with the authority to purchase or guarantee up to $700 billion in troubled assets held by financial institutions.  Treasury was directed to exercise this authority to promote the liquidity and stability of the financial system.

213.    As of March 31, 2010, the PPIF Managers had acquired $8.8 billion of the non-agency RMBS.  The Legacy PPIP Second Quarterly Report states:  "As of March 31, 2010, the eight funds participating in the program had acquired just over $10 billion in eligible assets, compared to $3.4 billion at the end of 2009.  About 88 percent of the PPIP portfolio holdings, or $8.8 billion, are non-agency residential mortgage-backed securities (RMBS).  Twelve percent, or $1.2 billion, are commercial mortgage-backed securities (CMBS).  Of the RMBS assets, nearly half fall into the Alt-A loan category."  The PPIF Managers have $25.1 billion of remaining purchasing power, which figure would mean purchases of an additional $22.1 billion of non-agency RMBS (applying the 88 percent

ratio of the current portfolio). Thus, PPIF Managers, using TARP funds provided by the Treasury, will soon own over $30 billion of non-agency RMBS under the PPIP.

214. Upon information and belief, the purchases by the PPIF Managers include the securities for the MBS trusts in which the Defendants participate, as described herein, including forged assignments.

### D. MBS Purchases by Federal Reserve and Treasury Direct Purchases

215. On December 30, 2008, the Federal Reserve and the U.S. Treasury announced that they would purchase agency MBS to support the housing market, and to date it has purchased $1.25 trillion of those securities. *See*, Press release, Federal Reserve Bank, Dec. 30, 2008 (http://www.federalreserve.gov/newsevents/press/ monetary/20081230b.htm); *and see*, MBS purchase program FAQs, N.Y. Federal Reserve Bank (http://www.newyorkfed.org/markets/mbs_faq.html). On January 8, 2010, the *Wall St. Journal* reported that: "The Fed now holds $909 billion of mortgage-backed securities. In the past year it has purchased 73% of the mortgages that government-backed Fannie Mae, Freddie Mac and Ginnie Mae have turned into securities. Purchases by the Treasury pushed total government purchases above $1 trillion." Liz Rappaport and Jon Hilsenrath, "Fed Plan to Stop Buying Mortgages Feeds Recovery Worries," *WSJ*, Jan. 8, 2010 (http://online.wsj.com/article/ SB126291088200220743.html).

### E. Damages to the U.S. Government

#### 1. Impaired Value of MBS

216. Each of the Defendants named herein participates, or has participated, in MBS trusts that are missing lawful assignments from originating banks to the trusts, and has used forged instruments instead. To date, the Defendants had not disclosed to

investors, particularly the Treasury, that the trust assets were severely impaired because of the forged and fraudulent assignments.

217.  In any foreclosures on assets in the trust, the Trustee Bank Defendants will be unable, or will have to expend significant funds, to prove their allegations that the trust is the lawful owner of the subject mortgage, in addition to expenses due to the filing of forged assignments.  The amount the Trustee Bank Defendants will expend to prove their ownership is materially more than they would have spent if they had complied with the procedures described in the respective prospectus and Pooling & Servicing Agreement. In addition, the value of the security must be discounted to account for the risk that a court may not recognize the trust as the legal owner of the security, and thus deny foreclosure on the collateral. The cost for the Trustee Bank Defendants to establish their trust is the owner of each mortgage included in the MBS is a financial harm to the U.S. government, as a purchaser of the MBS.

218.  Relator prepared a list of the trusts that have missing assignments and are using fabricated replacement assignments, as determined by an analysis of mortgage assignments conducted by Relator.  An earlier version of this list was provided by Relator on March 16, 2010, to the FBI Special Agent in Jacksonville, Florida, investigating the fraudulent mortgage assignments.

### 2.    Overcharges for fraudulent services and services not provided

219.  Each of the Defendants named herein participates, or has participated, in MBS trusts that are missing lawful assignments from originating banks to the trusts, and has used forged instruments instead.  To proceed with foreclosure actions, the Defendants created fraudulent mortgage assignments and charged the MBS Trusts for the costs associated with the creation of these documents.  Likewise, Defendants charged the MBS

Trusts for services that were never provided, including the custodial services related to notes and mortgage assignments.

220.    The distributions to the certificateholders, including the U.S. government are diminished by the servicing fees paid to the Mortgage Foreclosure Servicing Defendants for their unlawful services or for not providing any service.  The cost paid for these services is a financial harm to the U.S. government, as certificateholder of the MBS.

### 3.    Fannie Mae and Freddie Mac

221.    Both the Federal National Mortgage Association, Inc. ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") also paid the mortgage service defendants named herein millions of dollars in U.S. government funds to provide services involving mortgage assignments.  Fannie Mae and Freddie Mac are government-sponsored enterprises ("GSEs"), which are corporations with public purposes created by the U.S. government.  The primary purpose of Fannie Mae and Freddie Mac is to provide funding for the U.S. mortgage market by purchasing mortgages from banks and other direct lenders and packaging them, to ensure that adequate capital is available to banks and other financial institutions that lend money to home buyers.  The two entities provide funding for more than $6.3 trillion of the $11 trillion U.S. mortgage market.

222.    The U.S. government has invested substantial sums in MBS through financial support of its GSEs.  During the financial crisis, on September 7, 2008, Fannie Mae and Freddie Mac were essentially nationalized to avoid losses and provide financial stability to the mortgage market.  They were taken over by the U.S. government in a conservatorship.  Since that event, Fannie Mae and Freddie Mac have received nearly $145 billion in taxpayer support through the Treasury, divided as $83 billion to Fannie

Mae and $61 billion to Freddie Mac, according to SEC filings and press releases. At the time of the conservatorship, former Treasury Secretary Henry Paulson put a ceiling of $100 billion for investments in each company. But in February 2009, his successor, Timothy Geithner, raised the cap to $200 billion each. In December 2009, the Treasury said it would provide unlimited financial support to ensure the survival and liquidity of Fannie Mae and Freddie Mac for three years.

223.   Fannie Mae and Freddie Mac use mortgage servicing companies, including defendants AHMS, WELLS/ASC, SAXON and LPS, to service the loans that they acquire.

224.   As part of the services provided to Fannie Mae and Freddie Mac, defendants AHMS, WELLS/ASC and SAXON prepared and filed forged mortgage assignments in South Carolina, and throughout the United States, assigning mortgages to themselves, and bringing foreclosure actions in the names of the servicing companies. In thousands of cases, defendants AHMS, WELLS/ASC and SAXON used defendant LPS, or attorneys hired by LPS, to prepare and file such assignments to the servicing companies.

225.   The assignments prepared and filed by the servicer defendants were fraudulent. The servicers failed to obtain valid assignments when the loans were purchased by Fannie Mae and Freddie Mac. The servicers then tried to secretly substitute "replacement" assignments. In hundreds of thousands of cases, these replacement assignments were defective for one or more of the following reasons:

> (1)  the individual or individuals signing as officers of the grantor were actually employees of the grantee servicing company;
> (2)  employees of the servicing companies often signed several thousand replacement assignments in a single week, at a pace that makes it

obvious they did not review what they signed and completely disregarded the veracity of the information on such assignments, including the effective date of the transfer (stated on many such documents as 9/9/999); and

(3) to expedite the document production, employees of the servicing companies often signed each other's names and also forged the signature of the notary on such documents.

226.     The services of the defendants AHMS, WELLS/ASC, SAXON, and LPS, actually provided to Fannie Mae and Freddie Mac, which were paid for with U.S. government funds, were fraudulent and illegal.

227.     In addition, Fannie Mae and Freddie Mac and other federal government agencies, including the U.S. Department of Housing and Urban Development, provide guarantees to lenders in the event that borrowers default on their mortgages.  Each time a Defendant lacking valid notes and mortgage assignments submitted a claim for payment on such guarantee, said Defendant submitted a false claim for payment or approval.  The U.S. government has been damaged to the extent that it has made payments on such guarantees.

### 4.     Federal Taxes From Trusts' Loss of Tax Status due to Assignments Made After the Date of Trust Formation

228.     The most significant reason that trusts do not acquire loans after the closing date of the trust is that such actions may have negative tax consequences for the trusts.  MBS trusts are created as Real Estate Mortgage Investment Conduits, or "REMICS" (a type of special purpose vehicle used for the pooling of mortgage loans and issuance of mortgage-backed securities). REMICS are defined under the U.S. Internal Revenue Code (Tax Reform Act of 1986).

229.     The advantage of REMICS is that income from REMICS is tax exempt from double taxation.  Because of the tax advantages, tax law limits and strictly regulates

REMIC transactions. All contributions, *i.e.*, the delivery of the mortgage loans into the trust, to the REMIC must occur on the "start up date," or at most 90 days after this date, which is also the "cut-off date" specified in the MBS trust prospectus. All other contributions after the cut-off date are considered under the tax code as prohibited activities. Therefore, if a mortgage loan has not been identified by the cut-off date (*i.e.*, placed in the securitization pipeline by the originating bank), any transfer of the borrower's mortgage note and/or mortgage into the MBS trust after the cutoff date triggers a 100% penalty tax on the late contribution.

230.    Each of the Trustee Bank Defendants has assigned mortgages to their respective MBS trusts after the cut-off date, triggering taxes owed to the U.S. government, which remain unpaid.

**VIII.    THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, HAWAII, ILLINOIS, INDIANA, MASSACHUSETTS, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, RHODE ISLAND, VIRGINIA, DISTRICT OF COLUMBIA, THE CITY OF CHICAGO AND THE CITY OF NEW YORK PURCHASED MORTGAGE-BACKED SECURITIES MADE UP OF MORTGAGES WITH MISSING OR FORGED ASSIGNMENTS FROM ORIGINATING BANKS TO THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL FINANCIAL HARM**

231.    The quarterly report on the State of California pooled money investment account for the quarter ending March 31, 2009 shows that the State of California purchased RMBS, valued at that date over $1 billion. The report for the following quarter indicated that the State of California still held the RMBS, valued less than $1 billion at the time.[11]

---

[11] *See* http://www.treasurer.ca.gov/pmia-laif/reports/quarterly/200903.pdf and *http://www.treasurer.ca.gov/pmia-laif/reports/quarterly/200906.pdf.*

232.     The State of New Jersey also invested in RMBS, as indicated in the memorandum to the State Investment Council in May 2008. [12]

233.     The State of New Mexico invested in RMBS, as indicated in the State Investment Council's minutes of 2008.[13]

234.     The State of North Carolina purchased over $1 billion of RMBS, according to the 2009 State Treasurer's annual report for the fiscal year 2008-2009.[14]

235.     Upon information and belief, the States of Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York also purchased securities issued by MBS Trusts with missing mortgage assignments.

236.     Each of the Defendants named herein participates, or has participated, in MBS trusts that are missing lawful assignments from originating banks to the trusts, and has used forged instruments instead. To date, the Defendants had not disclosed to investors, including the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New

Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York that the trust assets were severely impaired because of the forged and fraudulent assignments.

---

[12] See *http://www.state.nj.us/treasury/doinvest/pdf/Real%20Estate%20Investment%20Presented%2005-08.pdf*.

[13] See http://www.sic.state.nm.us/PDF%20files/52708_SIC_Index_Minutes_Final.pdf.

[14] The report is available at https://www.nctreasurer.com/NR/rdonlyres/DAD12892-8069-41F7-A36D-31EBF1776613/0/DepartmetofStateTreasurer2009AnnualReport.pdf.

237.    In any foreclosures on assets in the trust, the Trustee Bank Defendants will be unable, or will have to expend significant funds, to prove their allegations that the trust is the lawful owner of the subject mortgage, in addition to expenses due to the filing of forged assignments.  The amount the Trustee Bank Defendants will expend to prove their ownership is materially more than they would have spent if they had complied with the procedures described in the respective prospectus and Pooling & Servicing Agreement. In addition, the value of the security must be discounted to account for the risk that a court may not recognize the trust as the legal owner of the security, and thus deny foreclosure on the collateral. The cost for the Trustee Bank Defendants to establish their trust is the owner of each mortgage included in the MBS is a financial harm to the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York as purchasers of the MBS.

238.    The States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York purchased RMBS including forged or fraudulent assignment at inflated value because the Defendants misrepresented to the States their compliance with the Prospectuses and related documentation.

239.    Furthermore, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia,

the City of Chicago and the City of New York suffered financial harm caused by each payment to the Defendants for creating false assignments or for services that were never provided, including the custodial services related to notes and mortgage assignments.

240.    The distributions to the certificateholders, including the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York are diminished by the servicing fees paid to the Mortgage Foreclosure Servicing Defendants for their unlawful services or for not providing any service. The cost paid for these services is a financial harm to the States of California, Delaware, District of Columbia, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, the City of Chicago and the City of New York as certificateholders of the MBS.

## IX.    CAUSES OF ACTION

### COUNT I
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)[15]
### Against All Defendants

241.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

242.    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

243.    As alleged in paragraphs 1-240, the Defendants created, sold or participated in mortgage-backed securities.

---

[15] To the extent wrongdoing occurred prior to May 6, 2009, this Complaint should be deemed to include violations of the FCA prior to recent amendments to that statute, *e.g.*, 31 U.S.C. § 37290(a)(1), (a)(2), and (a)(3).

244.     As further alleged in paragraphs 1-240, the mortgage-backed securities were composed of mortgages bundled to create the securities in which the mortgages lacked the requisites to create a secured, real estate debt obligation, namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes bundled in the securities.

245.     By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the Treasury, or other entity funded by the U.S. government, violated state and federal laws and furthered an effort to transfer impaired securities to the Treasury, or other government funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the Treasury, or other government funded entity impaired securities.  Defendants received millions of dollars in U.S. government funds to provide services involving fraudulent mortgage assignments or received payments on federal government guarantees of mortgages.  Defendants falsely represented, in connection with submitting claims on mortgage guarantees, that they held good title to the notes and mortgages.  Accordingly, the Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the government entity purchasing the mortgage-backed securities or being asked to make a payment pursuant to a mortgage guarantee.

246.    The United States, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made by the United States' fiscal intermediaries for claims that would otherwise would not have been paid.

247.    By reason of the payments and approvals, the United States has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

### COUNT II
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### Against all Defendants

248.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

249.    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

250.    As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

251.    As further alleged in paragraphs 1-240, the mortgage-backed securities were composed of mortgages bundled to create the securities in which the mortgages lacked the requisites to create a secured, real estate debt obligation, namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, promised that the trust held good title to the mortgages and notes bundled in the securities.

252.    By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the

81

mortgage-backed securities sold to the Treasury, or other government funded entity, violated state and federal laws and furthered an effort to transfer impaired securities to the Treasury, or other government funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the Treasury, or other government funded entity impaired securities. Defendants received millions of dollars in U.S. government funds to provide services involving fraudulent mortgage assignments or received payments on federal government guarantee of mortgages.  Defendants falsely represented, in connection with submitting claims on mortgage guarantees, that they held good title to the notes and mortgages.  In connection with the submission of these claims in the sale of the mortgage-backed securities to the government, or government funded entity, each of the Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the Treasury, or other U.S. government funded entity purchasing mortgage-backed securities or being asked to make a payment pursuant to a mortgage guarantee.

253.    The United States, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made by the United States' fiscal intermediaries for claims that would otherwise would not have been paid.

254.    By reason of the payments and approvals, the United States has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

### COUNT III
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(D)
### Against All Defendants

255.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

256.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

257.     As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

258.     As further alleged in paragraphs 1-240, the MBS Trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

259.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

260.     By virtue of the wrongful conduct alleged here including, but not limited to, the creation of  false mortgage assignments and payments for services that were never provided, each of the Defendants had possession, custody or control of property or money used, or to be used by the Government and knowingly delivered, or caused to be delivered to the U.S. government, investor in the MBS Trusts, less than all of that money or property.

261. By reason of this unlawful conduct, the United States has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT IV
## Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
## Against All Defendants

262. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

263. This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

264. As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

265. As further alleged in paragraphs 1-240, the Defendants that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

266. As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services related to the notes and mortgage assignments.

267. By virtue of the wrongful conduct alleged here including, but not limited to, the creation of false mortgage assignments, the Defendants knowingly made, used, or

caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

268.    By reason of this unlawful conduct, the United States has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT V**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**Against all Defendants**

269.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

270.    As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

271.    As further alleged in paragraphs 1-240, the mortgage-backed securities were composed of mortgages bundled to create the securities in which the mortgages lacked the requisites to create a secured, real estate debt obligation, namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, promised that the trust held good title to the mortgages and notes bundled in the securities.

272.    As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided,

including, but not limited to, custodial services relating to the notes and mortgage assignments.

273.    By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, Defendants conspired to violated state and federal laws and furthered an effort to transfer impaired securities to the Treasury, or other government funded entity.  Defendants acted in concert to create fraudulent legal documentation to conceal that the trust was missing title to the assets, thus impairing the value of the securities sold to the Treasury, or other government funded entity. Each of the mortgage-backed securities sold to the Treasury, or other government funded entity, was in violation of state and federal law.  Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody or control to the U.S. government.  Defendants acted in concert to make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the U.S. government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the U.S. government.

274.    Through the conduct set forth above, Defendants conspired to commit a violation of  31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), § 3729(a)(1)(D), and § 3729(a)(1)(G).

## COUNT VI
### North Carolina False Claims Act,
### N.C. Gen. Stat. §§ 1-607 (a)(1)-(a)(4), 1-607 (a)(7)
### Against All Defendants

275.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

276.     This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*.

277.     As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

278.     As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

279.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

280.     By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of North Carolina, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of North Carolina, or other state funded entity impaired securities. In connection with the submission of these claims in

the sale of the mortgage-backed securities to the State of North Carolina, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of North Carolina to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the state entity purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the State of North Carolina, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the North Carolina False Claims Act and furthered an effort to transfer impaired securities to the State of North Carolina, or other State funded entity. Each of the Defendants had possession, custody or control of property or money used, or to be used by the State and knowingly delivered, or caused to be delivered to the State of North Carolina, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of North Carolina, or other state funded entity. Each of the mortgage-backed securities sold to the State of North Carolina, or other state funded entity, was in violation of law. Defendants further acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody or control to the State, or state-funded entity. Defendants acted in

88

concert to knowingly make, use, or cause to be made or use, false records or statements

material to an obligation to pay or transmit money or property to the State, or state

funded entity or knowingly concealed or knowingly and improperly avoided or decreased

an obligation to pay or transmit money or property to the State or state funded entity.

281.    The State of North Carolina, unaware of the falsity or fraudulent nature of

the claims made by the Defendants, approved, paid and participated in payments made

for claims that otherwise would not have been paid.

282.    By reason of the payments and approvals, the State of North Carolina has

been damaged, and possibly continues to be damaged, in an amount yet to be determined.

### COUNT VII
### California False Claims Act,
### Cal. Govt. Code §§ 12651 (a)(1)- (a)(4), 12651 (a)(7)-(a)(8)
### Against All Defendants

283.    Relator realleges and incorporates herein by reference all the allegations

set forth in paragraphs 1 through 240  of this Complaint.

284.    This is a claim for treble damages and civil penalties under the California

False Claims Act, Cal. Gov.t Code § 12650 *et seq.*.

285.    As alleged in paragraphs 1-240, the Defendants, and each of them,

created, sold or participated in mortgage-backed securities.

286.    As further alleged in paragraphs 1-240, the trusts that issued mortgage-

backed securities lacked the requisites necessary for the securities to have the security

that was represented namely: (1) the legally binding assignments from the originating

bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in

the county recorder's office; and (3) original note and mortgage, signed by both borrower

and lender.  The prospectus for each mortgage-backed securities trust, and other public

statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

287. As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

288. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of California, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of California, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of California, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of California to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the state entity purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of California, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the California False Claims Act and furthered an effort to transfer impaired securities to the State of

90

California, or other State funded entity.  Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of California, or other state funded entity. Each of the mortgage-backed securities sold to the State of California, or other state funded entity, was in violation of law.  Each of the Defendants had possession, custody or control of public property or money used, or to be used by the State and knowingly delivered, or caused to be delivered to the State of California, investor in the MBS Trusts, less than all of that money or property.  The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State or state funded entity.  Defendants conspired to commit a violation of the California False Claims Act and furthered an effort to transfer impaired securities to the State of California, or other State funded entity.  The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

289.    The State of California, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

290.    By reason of the payments and approvals, the State of California has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT VIII
### Delaware False Claims Act,
### Del. Code Ann. Tit. 6,§§ 1201 (a)(1)-(a)(4), 1201(a)(7)
### Against All Defendants

291.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

292.     This is a claim for treble damages and civil penalties under the Delaware False Claims Act, Del. Code Ann. Tit. 6, § 1201 *et seq.*.

293.     As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

294.     As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

295.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

296.     By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the

mortgage-backed securities sold to the State of Delaware, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Delaware, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Delaware, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of Delaware to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the state entity purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, directly or indirectly, false records or statements material to false or fraudulent claims to the State of Delaware, or other state funded entity purchasing mortgage-backed securities. Each of the Defendants had possession, custody or control of property or money used, or to be used by the State and, intending to defraud it delivered, or caused to be delivered to the State of Delaware, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State. Defendants conspired to commit a violation of the Delaware False Claims Act and furthered an effort to transfer impaired securities to the State of Delaware, or other State funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of

93

Delaware, or other state funded entity. Each of the mortgage-backed securities sold to the State of Delaware, or other state funded entity, was in violation of law.

297.     The State of Delaware, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

298.     By reason of the payments and approvals, the State of Delaware has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT IX**
**District of Columbia False Claims Act,**
**D.C. Code Ann. §§ 2-308.14 (a)(1)-(a)(4), 2-308.14 (a)(7)-(a)(8)**
**Against All Defendants**

299.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

300.     This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, DC. Code Ann. § 2-308.14 *et seq.*.

301.     As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

302.     As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

94

303.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

304.     By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the District of Columbia, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the District of Columbia, or other state funded entity impaired securities.  In connection with the submission of these claims in the sale of the mortgage-backed securities to the District of Columbia, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, District of Columbia to pay claims that are false or fraudulent. Defendants  knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the district purchasing the mortgage-backed securities.  Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the District of Columbia, or other state funded entity purchasing mortgage-backed securities..  Defendants conspired to commit a violation of the District of Columbia False Claims Act and furthered an effort to transfer impaired securities to the District of Columbia, or other District funded entity.  Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing

title to the assets, thus impairing the value of the securities sold to the District of Columbia, or other state funded entity. Each of the mortgage-backed securities sold to the District of Columbia, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used by the District and knowingly delivered, or caused to be delivered to the District, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the District. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the District within a reasonable time.

305. The District of Columbia, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

306. By reason of the payments and approvals, the District of Columbia has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

### COUNT X
**Florida False Claims Act,**
**Fla. Stat. Ann. §§ 68.081 (2)(a)-(2)(d), 68.081 (2)(g)**
**Against All Defendants**

307. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

308. This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*.

309. As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

310.     As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

311.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services.  Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

312.     By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Florida, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Florida, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Florida, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of Florida to pay claims that are false or fraudulent.  Defendants  knowingly presented or caused to be presented a

false or fraudulent claim for payment or approval from the agency purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the Florida False Claims Act and furthered an effort to transfer impaired securities to the State of Florida, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Florida, or other state funded entity. Each of the mortgage-backed securities sold to the State of Florida, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used by a state agency and, intending to deceive the agency or knowingly conceal the property, delivered or caused to be delivered less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to a State agency.

313.    The State of Florida, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

314.    By reason of the payments and approvals, the State of Florida has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XI
### Hawaii False Claims Act,
### Haw. Rev. Stat. §§ 661-21 (a)(1)-(a)(4), 661-21 (a)(7)-(a)(8)
### Against All Defendants

315.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

316.    This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*.

317.    As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

318.    As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities. Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services.  Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services related to the notes and mortgage assignments.

319.    By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Hawaii, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded

entity. Defendants and their agents and employees falsely represented that they held

good title to the MBS assets and sold to the State of Hawaii, or other state funded entity

impaired securities. In connection with the submission of these claims in the sale of the

mortgage-backed securities to the State of Hawaii, or state funded entity, each of the

Defendants knowingly caused, or assisted in causing, the State of Hawaii to pay claims

that are false or fraudulent. Defendants knowingly presented or caused to be presented a

false or fraudulent claim for payment or approval from the State purchasing the

mortgage-backed securities. Defendants further knowingly made, used or caused to be

made or used, false records or statements to get false or fraudulent claims paid or

approved by the State of Hawaii, or other state funded entity purchasing mortgage-

backed securities. Defendants conspired to commit a violation of the Hawaii False

Claims Act and furthered an effort to transfer impaired securities to the State of Hawaii,

or other state funded entity. Defendants acted in concert to create fraudulent legal

documentation to conceal that the trusts were missing title to the assets, thus impairing

the value of the securities sold to the State of Hawaii, or other state funded entity. Each of

the mortgage-backed securities sold to the State of Hawaii, or other state funded entity,

was in violation of law. Each of the Defendants had possession, custody or control of

property or money used, or to be used by the State and, intending to defraud the State,

delivered or caused to be delivered less than all of that money or property. The

Defendants knowingly made, used, or caused to be made or used, a false record or

statement to conceal, avoid or decrease an obligation to pay or transmit money or

property to the State of Hawaii. The Defendants benefited from the submission of false

claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

320.     The State of Hawaii, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

321.     By reason of the payments and approvals, the State of Hawaii has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT XII**
**Illinois Whistleblower Reward and Protection Act,**
**740 Ill. Comp. Stat. §§ 175/3 (a)(1)-(a)(4), 175/3 (a)-(7)**
**Against All Defendants**

322.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

323.     This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*.

324.     As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

325.     As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

326.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services related to the notes and mortgage assignments.

327.     By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Illinois, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Illinois, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Illinois, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of Illinois to pay claims that are false or fraudulent.  Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Illinois, or other state funded entity purchasing mortgage-backed securities.  Defendants conspired to commit a violation of the Illinois Whistleblower Reward and Protection Act, and furthered an effort to transfer impaired securities to the State of Illinois, or other state funded entity.  Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets,

102

thus impairing the value of the securities sold to the State of Illinios, or other state funded entity. Each of the mortgage-backed securities sold to the State of Illinois, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used by the State and, intending to defraud the State, delivered or caused to be delivered less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State of Illinois.

328. The State of Illinois, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

329. By reason of the payments and approvals, the State of Illinois has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT XIII**
**Indiana False Claims and Whistleblower Protection Act,**
**Ind. Code §§ 5-11-5.5-2(b)(1)-(b)(4), 5-11-5.5-2(b)(7)**
**Against All Defendants**

330. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

331. This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

332. As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

333. As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security

103

that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

334. As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

335. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Indiana, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Indiana, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Indiana, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of Indiana to pay claims that are false or fraudulent. Defendants knowingly presented a false or fraudulent claim for payment or approval from the State purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or

statements to obtain payment or approval of false or fraudulent claims by the State of Indiana, or other state funded entity purchasing mortgage-backed securities. Each of the Defendants with intent to defraud the State delivered less money or property to the State of Indiana, investor in the MBS Trusts. The Defendants knowingly made or used a false record or statement to avoid an obligation to pay or transmit money or property to the State. Defendants conspired to commit a violation of the Indiana False Claims and Whistleblower Protection Act, and furthered an effort to transfer impaired securities to the State of Indiana, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Indiana, or other state funded entity. Each of the mortgage-backed securities sold to the State of Indiana, or other state funded entity, was in violation of law. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Indiana, or other state funded entity. Each of the mortgage-backed securities sold to the State of Indiana, or other state funded entity, was in violation of law. Defendants further acted in concert to deliver, or cause to be delivered, less money or property to the State, or state-funded entity. Defendants acted in concert to make or use false records or statements to avoid an obligation to pay or transmit money or property to the State, or state funded entity.

336. The State of Indiana, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

337.     By reason of the payments and approvals, the State of Indiana has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT XIV**
**Massachusetts False Claims Act,**
**Mass. Ann. Laws Ch. 12, §§ 5(B)(1)-(B)(4), 5(B)(8)**
**Against All Defendants**

338.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

339.     This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(0).

340.     As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

341.     As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

342.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

343.    By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the Commonwealth of Massachusetts, violated state and federal laws and furthered an effort to transfer impaired securities to the Commonwealth of Massachusetts, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the Commonwealth of Massachusetts, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the Commonwealth of Massachusetts, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, Commonwealth of Massachusetts to pay claims that are false or fraudulent.  Defendants  knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the Commonwealth of Massachusetts purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to obtain payment or approval of false or fraudulent claims by the Commonwealth of Massachusetts, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the Massachusetts False Claims Act,  and furthered an effort to transfer impaired securities to the Commonwealth of Massachusetts, or other state funded entity.  Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the Commonwealth of Massachusetts, or other state funded entity. Each of the mortgage-backed securities sold to the Commonwealth of Massachusetts or other state funded entity, was in violation of law.

107

Each of the Defendants had possession, custody or control of property or money used, or to be used by the Commonwealth and knowingly delivered, or caused to be delivered to the Commonwealth, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Commonwealth. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the Commonwealth within a reasonable time.

344.    The Commonwealth of Massachusetts, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

345.    By reason of the payments and approvals, the Commonwealth of Massachusetts has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT XV**
**Minnesota False Claims Act,**
**Minn. Stat. §§ 15C.02(a)(1)-(a)(4), 15C.02(a)(7)**
**Against All Defendants**

346.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

347.    This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*.

348.    As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

349.     As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

350.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

351.     By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Minnesota, violated state and federal laws and furthered an effort to transfer impaired securities to the State of Minnesota, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Minnesota, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Minnesota, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of Minnesota to pay claims that are false or fraudulent.  Defendants  knowingly presented or

caused to be presented a false or fraudulent claim for payment or approval from the State of Minnesota purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to obtain false or fraudulent claims paid by the State of Minnesota, or other state funded entity purchasing mortgage-backed securities. Defendants knowingly conspired to commit a violation of the Minnesota False Claims Act, and furthered an effort to transfer impaired securities to the State of Minnesota, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Minnesota, or other state funded entity. Each of the mortgage-backed securities sold to the State of Minnesota or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used by the State and knowingly delivered, or caused to be delivered to the State, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State.

352.    The State of Minnesota, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

353.    By reason of the payments and approvals, the State of Minnesota has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT XVI**
**Montana False Claims Act,**
**Mont. Code Ann. §§ 17-8-403(1)(a)-(1)(d), 17-8-403(1)(g)-(h)**
**Against All Defendants**

354.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

355.     This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*.

356.     As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

357.     As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

358.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

359.     By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the

mortgage-backed securities sold to the State of Montana, violated state and federal laws and furthered an effort to transfer impaired securities to the State of Montana, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Montana, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Montana, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of Montana, to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Montana, purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid by the State of Montana, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the Montana False Claims Act, and furthered an effort to transfer impaired securities to the State of Montana, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Montana, or other state funded entity. Each of the mortgage-backed securities sold to the State of Montana, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of public property or money used, or to be used by the State and knowingly delivered, or caused to be delivered to the State, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money

112

or property to the State. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

360. The State of Montana, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

361. By reason of the payments and approvals, the State of Montana, has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

### COUNT XVII
### Nevada False Claims Act,
### Nev. Rev. Stat. §§ 357.040 (1)(a)- (1)(d), 357.040 (1)(g)-(1)(h)
### Against All Defendants

362. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

363. This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.*.

364. As alleged in paragraphs 1-240 the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

365. As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public

113

statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

366.    As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

367.    By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Nevada, violated state and federal laws and furthered an effort to transfer impaired securities to the State of Nevada, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Nevada, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Nevada, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of Nevada, to pay claims that are false or fraudulent.  Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Nevada, purchasing the mortgage-backed securities.  Defendants further knowingly made, used or caused to be made or used, false records or statements to obtain payment or approval of false or fraudulent claims by the State of Nevada, or other state funded entity purchasing mortgage-backed securities.  Defendants conspired to commit a violation of the Nevada False Claims Act,  and furthered an effort to transfer impaired securities to the State of

Nevada, or other state funded entity.  Defendants acted in concert to create fraudulent

legal documentation to conceal that the trusts were missing title to the assets, thus

impairing the value of the securities sold to the State of Nevada, or other state funded

entity.  Each of the mortgage-backed securities sold to the State of Nevada, or other state

funded entity, was in violation of law.  Each of the Defendants had possession, custody or

control of public property or money and knowingly delivered, or caused to be delivered

to the State, investor in the MBS Trusts, less than all of that money or property.  The

Defendants knowingly made, used, or caused to be made or used, a false record or

statement to conceal, avoid or decrease an obligation to pay or transmit money or

property to the State. The Defendants benefited from the submission of false claims and,

after discovering the falsity of the claim, failed to disclose the falsity to the State within a

reasonable time.

368.    The State of Nevada, unaware of the falsity or fraudulent nature of the

claims made by the Defendants, approved, paid and participated in payments made for

claims that otherwise would not have been paid.

369.    By reason of the payments and approvals, the State of Nevada, has been

damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XVIII
### New Hampshire False Claims Act,
### N.H. Rev. Stat. Ann. § 167:61-b (I)(a)-(I)(f)
### Against All Defendants

370.    Relator realleges and incorporates herein by reference all the allegations

set forth in paragraphs 1 through 240 of this Complaint.

371.    This is a claim for treble damages and civil penalties under the New

Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61 *et seq.*.

372.     As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

373.     As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

374.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

375.     By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of New Hampshire, violated state and federal laws and furthered an effort to transfer impaired securities to the State of New Hampshire, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of New Hampshire, or other state funded entity impaired securities.  In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of

New Hampshire, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of New Hampshire, to pay claims that are false or fraudulent. Defendants  knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of New Hampshire, purchasing the mortgage-backed securities.  Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Hampshire, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the New Hampshire False Claims Act,  and furthered an effort to transfer impaired securities to the State of New Hampshire, or other state funded entity.  Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of New Hampshire, or other state funded entity.  Each of the mortgage-backed securities sold to the State of New Hampshire, or other state funded entity, was in violation of law.  Each of the Defendants had possession, custody or control of property or money used, or to be used, by the State and, intending to defraud the State delivered, or caused to be delivered to the State, investor in the MBS Trusts, less than all of that money or property.  The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State. Defendants benefited from the submission of false claims and when discovered the falsity of the claim failed to disclose the false claim to the State within a reasonable time after discovery of the false claim.

376.     The State of New Hampshire, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

377.     By reason of the payments and approvals, the State of New Hampshire, has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XIX
### New Jersey False Claims Act,
### N.J. Stat. §§ 2A:32 C-3 (a)- (d); 2A:32 C-3 (g)
### Against All Defendants

378.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

379.     This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32 C-1 *et seq.*.

380.     As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

381.     As further alleged in paragraphs 1-240  the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

382.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

383.     By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of New Jersey, violated state and federal laws and furthered an effort to transfer impaired securities to the State of New Jersey, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of New Jersey, or other state funded entity impaired securities.  In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of New Jersey, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of New Jersey, to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of New Jersey, purchasing the mortgage-backed securities.  Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or other state funded entity purchasing mortgage-backed securities.  Defendants conspired to commit a violation of the New Jersey False Claims Act,  and furthered an effort to transfer impaired securities to the State of New Jersey, or other state funded entity.  Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were

missing title to the assets, thus impairing the value of the securities sold to the State of New Jersey, or other state funded entity. Each of the mortgage-backed securities sold to the State of New Jersey, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of public property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered to the State, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State.

384. The State of New Jersey, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

385. By reason of the payments and approvals, the State of New Jersey, has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XX
### New Mexico False Claims Act,
### N.M. Stat. Ann. §§ 27-14-3 (A)(1)-(A)(4), 27-14-3 (A)(7)-(A)(8)
### Against All Defendants

386. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

387. This is a claim for treble damages and civil penalties under the New Mexico False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*.

388. As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

389.     As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

390.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services.  Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

391.     By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of New Mexico, violated state and federal laws and furthered an effort to transfer impaired securities to the State of New Mexico, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of New Mexico, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of New Mexico, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of New Mexico, to pay claims that are false or fraudulent. Defendants knowingly presented or

caused to be presented a false or fraudulent claim for payment or approval from the State of New Mexico, purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to obtain approval or payment on a false or fraudulent claims by the State of New Mexico, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the New Mexico False Claims Act, and furthered an effort to transfer impaired securities to the State of New Mexico, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of New Mexico, or other state funded entity. Each of the mortgage-backed securities sold to the State of New Mexico, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used, by the State and, knowingly delivered, or caused to be delivered to the State, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State or benefited from the submission of a false claims and, having subsequently discovered the falsity of the claim, failed to disclose the false claim to the State within a reasonable time after discovery.

392.    The State of New Mexico, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

122

393.     By reason of the payments and approvals, the State of New Mexico, has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XXI
### New York False Claims Act,
### N.Y. State Fin. L. §§ 189.1.(a)-1.(d), 189.1.(g)
### Against All Defendants

394.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

395.     This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. St. Fin. L. § 187 *et seq.*.

396.     As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

397.     As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

398.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

399.     By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of New York, violated state and federal laws and furthered an effort to transfer impaired securities to the State of New York, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of New York, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of New York, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of New York, to pay claims that are false or fraudulent.  Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of New York, purchasing the mortgage-backed securities.  Defendants further knowingly made, used or caused to be made or used, false records or statements to get o false or fraudulent claims approved by the State of New York, or other state funded entity purchasing mortgage-backed securities.  Defendants conspired to commit a violation of the New York False Claims Act,  and furthered an effort to transfer impaired securities to the State of New York, or other state funded entity.  Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of New York, or other state funded entity.  Each of the mortgage-backed securities sold to the State of New York, or other state funded entity, was in violation of law.  Each of the Defendants had possession, custody or control of property or money used, or to be used, by the State and, intending to defraud the state or a local government, delivered, or caused to be delivered to the State,

124

investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State or state funded entity.

400. The State of New York, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

401. By reason of the payments and approvals, the State of New York, has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XXII
### Rhode Island False Claims Act,
### R.I. Gen. Laws§§ 9-1.1-3(a)(1)-(a)(4), 9-1.1-3(a)(7)
### Against All Defendants

402. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

403. This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws §9-1.1-1 *et seq.*.

404. As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

405. As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public

statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

406.    As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

407.    By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Rhode Island, violated state and federal laws and furthered an effort to transfer impaired securities to the State of Rhode Island, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Rhode Island, or other state funded entity impaired securities.  In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Rhode Island, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of Rhode Island, to pay claims that are false or fraudulent.  Defendants  knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Rhode Island, purchasing the mortgage-backed securities.  Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or other state funded entity purchasing mortgage-backed securities.  Defendants conspired to commit a violation of the Rhode Island False Claims Act,  and furthered an effort to transfer

impaired securities to the State of Rhode Island, or other state funded entity.  Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Rhode Island, or other state funded entity.  Each of the mortgage-backed securities sold to the State of Rhode Island, or other state funded entity, was in violation of law.  Each of the Defendants had possession, custody or control of property or money used, or to be used, by the State and, intending to defraud the State, delivered, or caused to be delivered, to the State, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State.

408.    The State of Rhode Island, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

409.    By reason of the payments and approvals, the State of Rhode Island, has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XXIII
### Virginia Fraud Against Taxpayers Act,
### Va. Code Ann. §§ 8.01-216.3 (A)(1)- (A-4), 8.01-216.3 (A)(7)
### Against All Defendants

410.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

411.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216 *et seq.*.

412.    As alleged in paragraphs 1-247, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

413.    As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

414.    As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

415.    By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the Commonwealth of Virginia, violated state and federal laws and furthered an effort to transfer impaired securities to the Commonwealth of Virginia, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the Commonwealth of Virginia or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the

Commonwealth of Virginia, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, Commonwealth of Virginia to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the Commonwealth of Virginia purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the Virginia Fraud Against Taxpayers Act, and furthered an effort to transfer impaired securities to the Commonwealth of Virginia, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the Commonwealth of Virginia, or other state funded entity. Each of the mortgage-backed securities sold to the Commonwealth of Virginia or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used, by the Commonwealth and, intending to defraud the Commonwealth, delivered, or caused to be delivered, to the Commonwealth, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Commonwealth.

416. The Commonwealth of Virginia, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

129

417.     By reason of the payments and approvals, the Commonwealth of Virginia has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XXIV
### City of Chicago False Claims Act,
### Chicago Code of Ordinances §§ 1-22-020(1)-(4), 1-22-020(7)
### Against All Defendants

418.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

419.     This is a claim for treble damages and civil penalties under the City of Chicago False Claims Act, Chicago Mun. Code § 1-22 *et seq.*

420.     As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

421.     As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

422.     As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided,

including, but not limited to, custodial services relating to the notes and mortgage
assignments.

423.    By virtue of the wrongful conduct alleged here including, but not limited
to, the false signatures used in manufactured mortgage assignments, each of the
mortgage-backed securities sold to the City of Chicago, violated state and federal laws
and furthered an effort to transfer impaired securities to the City of Chicago, or other
state funded entity.  Defendants and their agents and employees falsely represented that
they held good title to the MBS assets and sold to the City of Chicago impaired
securities. In connection with the submission of these claims in the sale of the mortgage-
backed securities to the City of Chicago, each of the Defendants knowingly caused, or
assisted in causing, the City of Chicago to pay claims that are false or fraudulent.
Defendants  knowingly presented or caused to be presented a false or fraudulent claim for
payment or approval from the City of Chicago purchasing the mortgage-backed
securities. Defendants further knowingly made, used or caused to be made or used, false
records or statements to get false or fraudulent claims paid or approved by the City of
Chicago purchasing mortgage-backed securities.  Defendants conspired to commit a
violation of the City of Chicago False Claims Act, and furthered an effort to transfer
impaired securities to the City of Chicago.  Defendants acted in concert to create
fraudulent legal documentation to conceal that the trusts were missing title to the assets,
thus impairing the value of the securities sold to the City of Chicago.  Each of the
mortgage-backed securities sold to the City of Chicago, was in violation of law.  Each of
the Defendants had possession, custody or control of property or money used, or to be
used, by the City of Chicago and, intending to defraud the City of Chicago, delivered, or

caused to be delivered, to the City of Chicago, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the City of Chicago.

424. The City of Chicago, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

425. By reason of the payments and approvals, the City of Chicago has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

### COUNT XXV
### New York City False Claims Act,
### NYC Admin. Code §§ 7-803 (a) (1)- (a)(4), 7-803 (a)(7)
### Against All Defendants

426. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 240 of this Complaint.

427. This is a claim for treble damages and civil penalties under the City of New York False Claims Act, NYC Admin. Code § 7-803.

428. As alleged in paragraphs 1-240, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

429. As further alleged in paragraphs 1-240, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public

statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

430.    As further alleged in paragraphs 1-240, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

431.    By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the City of New York, violated state and federal laws and furthered an effort to transfer impaired securities to the City of New York, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the City of New York impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the City of New York, each of the Defendants knowingly caused, or assisted in causing, the City of New York to pay claims that are false or fraudulent. Defendants  knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the City of New York purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the City of New York purchasing mortgage-backed securities.  Defendants conspired to commit a violation of the City of New York False Claims Act, and furthered an effort to transfer impaired securities to the City of New York.  Defendants acted in concert to create

133

fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the City of New York. Each of the mortgage-backed securities sold to the City of New York, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used, by the City of New York and, intending to defraud the City of New York, delivered, or caused to be delivered, to the City of New York, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the City of New York.

432.    The City of New York, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

433.    By reason of the payments and approvals, the City of New York has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Relator requests that judgment be entered against Defendants, ordering that:

a.      Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq*.;

b.      Defendants pay an amount equal to three times the amount of damages the United States, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York have sustained because of Defendants'

actions, plus a civil penalty against Defendants of not less than $5,000, and not more than

$10,000 for each violation of 31 U.S.C. § 3729 and similar provisions of the State False

Claims Acts, of the New York City False Claims Act and Chicago False Claims Act;

     c.     Relator be awarded the maximum amount allowed pursuant to 31 U.S.C.

§ 3730(d) and similar provisions of the State False Claims Acts, of the City of Chicago

False Claims Act and City of New York False Claims Act;;

     d.     Relator be awarded all costs of this action, including attorneys' fees,

expenses, and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State

False Claims Acts, of the City of Chicago False Claims Act and City of New York False

Claims Act;

     e.     The United States, the States of California, Delaware, Florida, Hawaii,

Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New

Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, District of

Columbia, the City of Chicago and City of New York and Relator be granted all such

other relief afforded by law as the Court deems appropriate;

## XI.    REQUEST FOR A TRIAL BY JURY

     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff/Relator

hereby demands a trial by jury.

Dated: May 13, 2011

                   **RICHARD A. HARPOOTLIAN P.A.**

                   s/Richard A. Harpootlian
                   Richard A. Harpootlian, Esq.
                   1410 Laurel Street
                   Post Office Box 1090
                   Columbia, SC 29202
                   Telephone:    (803) 252-4848

**JANET, JENNER & SUGGS, LLC**
Howard Janet, Esq.
Woodholme Center
1829 Reisterstown Road, Suite 320
Baltimore, MD 21208
Telephone:     (410) 653-3200
Facsimile:     (410) 653-9030

**JANET, JENNER & SUGGS, LLC**
Kenneth M. Suggs, Esq.
500 Taylor Street
Columbia, SC 29201
Telephone**:**     (803)- 726-0050
Facsimile:     (410) 653-9030

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer, Esq.
James J. Sabella, Esq.
Lydia Ferrarese, Esq.
485 Lexington Avenue
New York, NY 10017
Telephone:     (646) 722-8500
Facsimile:     (646) 722-8501

**GRANT & EISENHOFER P.A.**
Reuben Guttman, Esq.
1920 L Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:     (202) 386-9500
Facsimile:     (202) 350-5908

*Attorneys for Qui Tam Plaintiff Lynn E. Szymoniak*